AGOSTINI ET AL. *v.* FELTON ET AL.

No. 96–552.   Argued April 15, 1997—Decided June 23, 1997*

---

*Together with No. 96–553, *Chancellor, Board of Education of the City of New York, et al.* v. *Felton et al.*, also on certiorari to the same court.

O'CONNOR, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and SCALIA, KENNEDY, and THOMAS, JJ., joined.  SOUTER, J., filed a dissenting opinion, in which STEVENS and GINSBURG, JJ., joined, and in which BREYER, J., joined as to Part II, *post*, p. 240.  GINSBURG, J., filed a dissenting opinion, in which STEVENS, SOUTER, and BREYER, JJ., joined, *post*, p. 255.

*Acting Solicitor General Dellinger* argued the cause for the Secretary of Education, respondent under this Court's Rule 12.6, in support of petitioners.   With him on the briefs were *Assistant Attorney General Hunger, Deputy Solicitor General Waxman, Deputy Assistant Attorney General Preston, Paul R. Q. Wolfson, Michael Jay Singer,* and *Howard S. Scher.*

*Paul A. Crotty* argued the cause for petitioners in both cases.   With him on the briefs for petitioners in No. 96–553 were *Leonard Koerner* and *Stephen J. McGrath.   Kevin T.*

*Baine* and *Emmet T. Flood* filed a brief for petitioners in No. 96–552.

*Stanley Geller* argued the cause and filed a brief for respondents Felton et al.†

JUSTICE O'CONNOR delivered the opinion of the Court.

In *Aguilar* v. *Felton*, 473 U. S. 402 (1985), this Court held that the Establishment Clause of the First Amendment barred the city of New York from sending public school teachers into parochial schools to provide remedial education to disadvantaged children pursuant to a congressionally mandated program. On remand, the District Court for the Eastern District of New York entered a permanent injunction reflecting our ruling. Twelve years later, petitioners—the parties bound by that injunction—seek relief from its operation. Petitioners maintain that *Aguilar* cannot be

†Briefs of *amici curiae* urging reversal were filed for the Becket Fund for Religious Liberty by *Kevin J. Hasson;* for the Christian Legal Society et al. by *Michael W. McConnell, Thomas C. Berg, Steven T. McFarland, Kimberlee Wood Colby,* and *Samuel B. Casey;* for the Knights of Columbus by *James W. Shannon, Jr.;* for the National Jewish Commission on Law and Public Affairs by *Nathan Lewin* and *Dennis Rapps;* for Senator Robert F. Bennett by *Ronald D. Maines;* and for Sarah Peter et al. by *Michael Joseph Woodruff* and *Scott J. Ward.*

Briefs of *amici curiae* urging affirmance were filed for the American Jewish Congress et al. by *Norman Redlich, Marc D. Stern, Marvin E. Frankel, David J. Strom, Richard T. Foltin, J. Brent Walker, Melissa Rogers, Robert Chanin, John West, Elliot M. Mincberg,* and *Judith E. Schaeffer;* and for Americans United for Separation of Church and State et al. by *Steven K. Green, Julie A. Segal, Steven R. Shapiro,* and *Arthur N. Eisenberg.*

Briefs of *amici curiae* were filed for the Council on Religious Freedom et al. by *Lee Boothby, Walter E. Carson,* and *Robert W. Nixon;* for the Institute for Justice et al. by *Mark Snyderman, William H. Mellor III,* and *Clint Bolick;* for the New York County Lawyers Association Committee on Supreme Court of the United States by *H. Elliot Wales;* for the Pacific Legal Foundation by *Sharon L. Browne;* and for the United States Catholic Conference by *Mark E. Chopko, John A. Liekweg,* and *Jeffrey Hunter Moon.*

squared with our intervening Establishment Clause jurisprudence and ask that we explicitly recognize what our more recent cases already dictate: *Aguilar* is no longer good law. We agree with petitioners that *Aguilar* is not consistent with our subsequent Establishment Clause decisions and further conclude that, on the facts presented here, petitioners are entitled under Federal Rule of Civil Procedure 60(b)(5) to relief from the operation of the District Court's prospective injunction.

I

In 1965, Congress enacted Title I of the Elementary and Secondary Education Act of 1965, 79 Stat. 27, as modified, 20 U. S. C. § 6301 *et seq.*, to "provid[e] full educational opportunity to every child regardless of economic background." S. Rep. No. 146, 89th Cong., 1st Sess., 5 (1965) (hereinafter Title I). Toward that end, Title I channels federal funds, through the States, to "local educational agencies" (LEA's). 20 U. S. C. §§ 6311, 6312.* The LEA's spend these funds to provide remedial education, guidance, and job counseling to eligible students. §§ 6315(c)(1)(A) (LEA's must use funds to "help participating children meet . . . State student performance standards"), 6315(c)(1)(E) (LEA's may use funds to provide "counseling, mentoring, and other pupil services"); see also §§ 6314(b)(1)(B)(i), (iv). An eligible student is one (i) who resides within the attendance boundaries of a public school located in a low-income area, § 6313(a)(2)(B); and (ii) who is failing, or is at risk of failing, the State's student performance standards, § 6315(b)(1)(B). Title I funds must be made available to *all* eligible children, regardless of whether they attend public schools, § 6312(c)(1)(F), and the services provided to children attending private schools must

---

*Title I has been reenacted,. in varying forms, over the years, most recently in the Improving America's Schools Act of 1994, 108 Stat. 3518. We will refer to the current Title I provisions, which do not differ meaningfully for our purposes from the Title I program referred to in our previous decision in this litigation.

be "equitable in comparison to services and other benefits for public school children," § 6321(a)(3); see § 6321(a)(1); 34 CFR §§ 200.10(a), 200.11(b) (1996).

An LEA providing services to children enrolled in private schools is subject to a number of constraints that are not imposed when it provides aid to public schools. Title I services may be provided only to those private school students eligible for aid, and cannot be used to provide services on a "school-wide" basis. Compare 34 CFR § 200.12(b) (1996) with 20 U. S. C. § 6314 (allowing "school-wide" programs at public schools). In addition, the LEA must retain complete control over Title I funds; retain title to all materials used to provide Title I services; and provide those services through public employees or other persons independent of the private school and any religious institution. §§ 6321(c)(1), (2). The Title I services themselves must be "secular, neutral, and nonideological," § 6321(a)(2), and must "supplement, and in no case supplant, the level of services" already provided by the private school, 34 CFR § 200.12(a) (1996).

Petitioner Board of Education of the City of New York (hereinafter Board), an LEA, first applied for Title I funds in 1966 and has grappled ever since with how to provide Title I services to the private school students within its jurisdiction. Approximately 10% of the total number of students eligible for Title I services are private school students. See App. 38, 620. Recognizing that more than 90% of the private schools within the Board's jurisdiction are sectarian, *Felton* v. *Secretary, United States Dept. of Ed.*, 739 F. 2d 48, 51 (CA2 1984), the Board initially arranged to transport children to public schools for after-school Title I instruction. But this enterprise was largely unsuccessful. Attendance was poor, teachers and children were tired, and parents were concerned for the safety of their children. *Ibid.* The Board then moved the after-school instruction onto private school

campuses, as Congress had contemplated when it enacted Title I. See *Wheeler* v. *Barrera*, 417 U. S. 402, 422 (1974). After this program also yielded mixed results, the Board implemented the plan we evaluated in *Aguilar* v. *Felton*, 473 U. S. 402 (1985).

That plan called for the provision of Title I services on private school premises during school hours. Under the plan, only public employees could serve as Title I instructors and counselors. *Id.*, at 406. Assignments to private schools were made on a voluntary basis and without regard to the religious affiliation of the employee or the wishes of the private school. *Ibid.*; 739 F. 2d, at 53. As the Court of Appeals in *Aguilar* observed, a large majority of Title I teachers worked in nonpublic schools with religious affiliations different from their own. 473 U. S., at 406. The vast majority of Title I teachers also moved among the private schools, spending fewer than five days a week at the same school. *Ibid.*

Before any public employee could provide Title I instruction at a private school, she would be given a detailed set of written and oral instructions emphasizing the secular purpose of Title I and setting out the rules to be followed to ensure that this purpose was not compromised. Specifically, employees would be told that (i) they were employees of the Board and accountable only to their public school supervisors; (ii) they had exclusive responsibility for selecting students for the Title I program and could teach only those children who met the eligibility criteria for Title I; (iii) their materials and equipment would be used only in the Title I program; (iv) they could not engage in team teaching or other cooperative instructional activities with private school teachers; and (v) they could not introduce any religious matter into their teaching or become involved in any way with the religious activities of the private schools. *Ibid.* All religious symbols were to be removed from classrooms used

for Title I services. *Id.*, at 407. The rules acknowledged that it might be necessary for Title I teachers to consult with a student's regular classroom teacher to assess the student's particular needs and progress, but admonished instructors to limit those consultations to mutual professional concerns regarding the student's education. 739 F. 2d, at 53. To ensure compliance with these rules, a publicly employed field supervisor was to attempt to make at least one unannounced visit to each teacher's classroom every month. 473 U. S., at 407.

In 1978, six federal taxpayers—respondents here—sued the Board in the District Court for the Eastern District of New York. Respondents sought declaratory and injunctive relief, claiming that the Board's Title I program violated the Establishment Clause. The District Court permitted the parents of a number of parochial school students who were receiving Title I services to intervene as codefendants. The District Court granted summary judgment for the Board, but the Court of Appeals for the Second Circuit reversed. While noting that the Board's Title I program had "done so much good and little, if any, detectable harm," 739 F. 2d, at 72, the Court of Appeals nevertheless held that *Meek* v. *Pittenger*, 421 U. S. 349 (1975), and *Wolman* v. *Walter*, 433 U. S. 229 (1977), compelled it to declare the program unconstitutional. In a 5-to-4 decision, this Court affirmed on the ground that the Board's Title I program necessitated an "excessive entanglement of church and state in the administration of [Title I] benefits." 473 U. S., at 414. On remand, the District Court permanently enjoined the Board

> "from using public funds for any plan or program under [Title I] to the extent that it requires, authorizes or permits public school teachers and guidance counselors to provide teaching and counseling services on the premises of sectarian schools within New York City." App. to Pet. for Cert. in No. 96–553, pp. A25–A26.

The Board, like other LEA's across the United States, modified its Title I program so it could continue serving those students who attended private religious schools. Rather than offer Title I instruction to parochial school students at their schools, the Board reverted to its prior practice of providing instruction at public school sites, at leased sites, and in mobile instructional units (essentially vans converted into classrooms) parked near the sectarian school. The Board also offered computer-aided instruction, which could be provided "on premises" because it did not require public employees to be physically present on the premises of a religious school. App. 315.

It is not disputed that the additional costs of complying with *Aguilar*'s mandate are significant. Since the 1986–1987 school year, the Board has spent over $100 million providing computer-aided instruction, leasing sites and mobile instructional units, and transporting students to those sites. App. 333 ($93.2 million spent between 1986–1987 and 1993–1994 school years); *id.*, at 336 (annual additional costs average around $15 million). Under the Secretary of Education's regulations, those costs "incurred as a result of implementing alternative delivery systems to comply with the requirements of *Aguilar* v. *Felton*" and not paid for with other state or federal funds are to be deducted from the federal grant before the Title I funds are distributed to *any* student. 34 CFR § 200.27(c) (1996). These *"Aguilar* costs" thus reduce the amount of Title I money an LEA has available for remedial education, and LEA's have had to cut back on the number of students who receive Title I benefits. From Title I funds available for New York City children between the 1986–1987 and the 1993–1994 school years, the Board had to deduct $7.9 million "off-the-top" for compliance with *Aguilar*. App. 333. When *Aguilar* was handed down, it was estimated that some 20,000 economically disadvantaged children in the city of New York, see 473 U.S., at 431

214

(O'CONNOR, J., dissenting), and some 183,000 children nationwide, see L. Levy, The Establishment Clause 176 (1986), would experience a decline in Title I services. See also S. Rep. No. 100–222, p. 14 (1987) (estimating that *Aguilar* costs have "resulted in a decline of about 35 percent in the number of private school children who are served").

In October and December of 1995, petitioners—the Board and a new group of parents of parochial school students entitled to Title I services—filed motions in the District Court seeking relief under Federal Rule of Civil Procedure 60(b) from the permanent injunction entered by the District Court on remand from our decision in *Aguilar.* Petitioners argued that relief was proper under Rule 60(b)(5) and our decision in *Rufo* v. *Inmates of Suffolk County Jail,* 502 U. S. 367, 388 (1992), because the "decisional law [had] changed to make legal what the [injunction] was designed to prevent." Specifically, petitioners pointed to the statements of five Justices in *Board of Ed. of Kiryas Joel Village School Dist.* v. *Grumet,* 512 U. S. 687 (1994), calling for the overruling of *Aguilar.* The District Court denied the motion. The District Court recognized that petitioners, "at bottom," sought "a procedurally sound vehicle to get the [propriety of the injunction] back before the Supreme Court," App. to Pet. for Cert. in No. 96–553, p. A12, and concluded that "the Board ha[d] properly proceeded under Rule 60(b) to seek relief from the injunction." *Id.,* at A19. Despite its observations that "the landscape of Establishment Clause decisions has changed," *id.,* at A10, and that "[t]here may be good reason to conclude that *Aguilar*'s demise is imminent," *id.,* at A20, the District Court denied the Rule 60(b) motion on the merits because *Aguilar*'s demise had "not yet occurred." The Court of Appeals for the Second Circuit "affirmed substantially for the reasons stated in" the District Court's opinion. App. to Pet. for Cert. in No. 96–553, p. A5; judgt. order reported at 101 F. 3d 1394 (1996). We granted certiorari, 519 U. S. 1086 (1997), and now reverse.

## II

The question we must answer is a simple one: Are petitioners entitled to relief from the District Court's permanent injunction under Rule 60(b)? Rule 60(b)(5), the subsection under which petitioners proceeded below, states:

"On motion and upon such terms as are just, the court may relieve a party . . . from a final judgment [or] order . . . [when] it is no longer equitable that the judgment should have prospective application."

In *Rufo* v. *Inmates of Suffolk County Jail, supra,* at 384, we held that it is appropriate to grant a Rule 60(b)(5) motion when the party seeking relief from an injunction or consent decree can show "a significant change either in factual conditions or in law." A court may recognize subsequent changes in either statutory or decisional law. See *Railway Employees* v. *Wright,* 364 U. S. 642, 652–653 (1961) (consent decree should be vacated under Rule 60(b) in light of amendments to the Railway Labor Act); *Rufo, supra,* at 393 (vacating denial of Rule 60(b)(5) motion and remanding so District Court could consider whether consent decree should be modified in light of *Bell* v. *Wolfish,* 441 U. S. 520 (1979)); *Pasadena City Bd. of Ed.* v. *Spangler,* 427 U. S. 424, 437–438 (1976) (injunction should have been vacated in light of *Swann* v. *Charlotte-Mecklenburg Bd. of Ed.,* 402 U. S. 1 (1971)). A court errs when it refuses to modify an injunction or consent decree in light of such changes. See *Wright, supra,* at 647 ("[T]he court cannot be required to disregard significant changes in law or facts if it is satisfied that what it has been doing has been turned through changed circumstances into an instrument of wrong" (internal quotation marks omitted)).

Petitioners point to three changes in the factual and legal landscape that they believe justify their claim for relief under Rule 60(b)(5). They first contend that the exorbitant costs of complying with the District Court's injunction con-

stitute a significant factual development warranting modification of the injunction. See Brief for Petitioner Agostini et al. 38–40. Petitioners also argue that there have been two significant legal developments since *Aguilar* was decided: a majority of Justices have expressed their views that *Aguilar* should be reconsidered or overruled, see *supra*, at 214; and *Aguilar* has in any event been undermined by subsequent Establishment Clause decisions, including *Witters* v. *Washington Dept. of Servs. for Blind*, 474 U. S. 481 (1986), *Zobrest* v. *Catalina Foothills School Dist.*, 509 U. S. 1 (1993), and *Rosenberger* v. *Rector and Visitors of Univ. of Va.*, 515 U. S. 819 (1995).

Respondents counter that, because the costs of providing Title I services off site were known at the time *Aguilar* was decided, and because the relevant case law has not changed, the District Court did not err in denying petitioners' motions. Obviously, if neither the law supporting our original decision in this litigation nor the facts have changed, there would be no need to decide the propriety of a Rule 60(b)(5) motion. Accordingly, we turn to the threshold issue whether the factual or legal landscape has changed since we decided *Aguilar*.

We agree with respondents that petitioners have failed to establish the significant change in factual conditions required by *Rufo*. Both petitioners and this Court were, at the time *Aguilar* was decided, aware that additional costs would be incurred if Title I services could not be provided in parochial school classrooms. See App. 66–68 (Defendants' Joint Statement of Material Facts Not In Dispute, filed in 1982, detailing costs of providing off-premises services); *Aguilar*, 473 U. S., at 430–431 (O'CONNOR, J., dissenting) (observing that costs of complying with *Aguilar* decision would likely cause a decline in Title I services for 20,000 New York City students). That these predictions of additional costs turned out to be accurate does not constitute a change in factual conditions warranting relief under Rule 60(b)(5). Accord, *Rufo*,

*supra*, at 385 ("Ordinarily . . . modification should not be granted where a party relies upon events that actually were anticipated at the time [the order was entered]").

We also agree with respondents that the statements made by five Justices in *Kiryas Joel* do not, in themselves, furnish a basis for concluding that our Establishment Clause jurisprudence has changed. In *Kiryas Joel*, we considered the constitutionality of a New York law that carved out a public school district to coincide with the boundaries of the village of Kiryas Joel, which was an enclave of the Satmar Hasidic sect. Before the new district was created, Satmar children wishing to receive special educational services under the Individuals with Disabilities Education Act (IDEA), 20 U. S. C. § 1400 *et seq.*, could receive those services at public schools located outside the village. Because Satmar parents rarely permitted their children to attend those schools, New York created a new public school district within the boundaries of the village so that Satmar children could stay within the village but receive IDEA services on public school premises from publicly employed instructors. In the course of our opinion, we observed that New York had created the special school district in response to our decision in *Aguilar*, which had required New York to cease providing IDEA services to Satmar children on the premises of their private religious schools. 512 U. S., at 692. Five Justices joined opinions calling for reconsideration of *Aguilar*. See 512 U. S., at 718 (O'CONNOR, J., concurring in part and concurring in judgment); *id.*, at 731 (KENNEDY, J., concurring in judgment); *id.*, at 750 (SCALIA, J., joined by REHNQUIST, C. J., and THOMAS, J., dissenting). But the question of *Aguilar*'s propriety was not before us. The views of five Justices that the case should be reconsidered or overruled cannot be said to have effected a change in Establishment Clause law.

In light of these conclusions, petitioners' ability to satisfy the prerequisites of Rule 60(b)(5) hinges on whether our later Establishment Clause cases have so undermined

*Aguilar* that it is no longer good law. We now turn to that inquiry.

### III

### A

In order to evaluate whether *Aguilar* has been eroded by our subsequent Establishment Clause cases, it is necessary to understand the rationale upon which *Aguilar*, as well as its companion case, *School Dist. of Grand Rapids* v. *Ball*, 473 U. S. 373 (1985), rested.

In *Ball*, the Court evaluated two programs implemented by the School District of Grand Rapids, Michigan. The district's Shared Time program, the one most analogous to Title I, provided remedial and "enrichment" classes, at public expense, to students attending nonpublic schools. The classes were taught during regular school hours by publicly employed teachers, using materials purchased with public funds, on the premises of nonpublic schools. The Shared Time courses were in subjects designed to supplement the "core curriculum" of the nonpublic schools. *Id.*, at 375–376. Of the 41 nonpublic schools eligible for the program, 40 were "'pervasively sectarian'" in character—that is, "'the purpos[e] of [those] schools [was] to advance their particular religions.'" *Id.*, at 379.

The Court conducted its analysis by applying the three-part test set forth in *Lemon* v. *Kurtzman*, 403 U. S. 602 (1971):

> "First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; finally, the statute must not foster an excessive government entanglement with religion." 473 U. S., at 382–383 (quoting *Lemon, supra*, at 612–613) (citations and internal quotation marks omitted).

The Court acknowledged that the Shared Time program served a purely secular purpose, thereby satisfying the first

part of the so-called *Lemon* test. 473 U. S., at 383. Nevertheless, it ultimately concluded that the program had the impermissible effect of advancing religion. *Id.*, at 385.

The Court found that the program violated the Establishment Clause's prohibition against "government-financed or government-sponsored indoctrination into the beliefs of a particular religious faith" in at least three ways. *Ibid.* First, drawing upon the analysis in *Meek* v. *Pittenger*, 421 U. S. 349 (1975), the Court observed that "the teachers participating in the programs may become involved in intentionally or inadvertently inculcating particular religious tenets or beliefs." 473 U. S., at 385. *Meek* invalidated a Pennsylvania program in which full-time public employees provided supplemental "auxiliary services"—remedial and accelerated instruction, guidance counseling and testing, and speech and hearing services—to nonpublic school children at their schools. 473 U. S., at 367–373. Although the auxiliary services themselves were secular, they were mostly dispensed on the premises of parochial schools, where "an atmosphere dedicated to the advancement of religious belief [was] constantly maintained." *Meek*, 421 U. S., at 371. Instruction in that atmosphere was sufficient to create "[t]he potential for impermissible fostering of religion." *Id.*, at 372. Cf. *Wolman* v. *Walter*, 433 U. S., at 248 (upholding programs employing public employees to provide remedial instruction and guidance counseling to nonpublic school children at sites away from the nonpublic school).

The Court concluded that Grand Rapids' program shared these defects. 473 U. S., at 386. As in *Meek*, classes were conducted on the premises of religious schools. Accordingly, a majority found a "'substantial risk'" that teachers—even those who were not employed by the private schools—might "subtly (or overtly) conform their instruction to the [pervasively sectarian] environment in which they [taught]." 473 U. S., at 388. The danger of "state-sponsored indoctrination" was only exacerbated by the school district's failure to

monitor the courses for religious content. *Id.*, at 387. Notably, the Court disregarded the lack of evidence of any specific incidents of religious indoctrination as largely irrelevant, reasoning that potential witnesses to any indoctrination—the parochial school students, their parents, or parochial school officials—might be unable to detect or have little incentive to report the incidents. *Id.*, at 388–389.

The presence of public teachers on parochial school grounds had a second, related impermissible effect: It created a "graphic symbol of the 'concert or union or dependency' of church and state," *id.*, at 391 (quoting *Zorach* v. *Clauson*, 343 U. S. 306, 312 (1952)), especially when perceived by "children in their formative years," 473 U. S., at 390. The Court feared that this perception of a symbolic union between church and state would "conve[y] a message of government endorsement . . . of religion" and thereby violate a "core purpose" of the Establishment Clause. *Id.*, at 389.

Third, the Court found that the Shared Time program impermissibly financed religious indoctrination by subsidizing "the primary religious mission of the institutions affected." *Id.*, at 385. The Court separated its prior decisions evaluating programs that aided the secular activities of religious institutions into two categories: those in which it concluded that the aid resulted in an effect that was "indirect, remote, or incidental" (and upheld the aid); and those in which it concluded that the aid resulted in "a direct and substantial advancement of the sectarian enterprise" (and invalidated the aid). *Id.*, at 393 (internal quotation marks omitted). In light of *Meek* and *Wolman*, Grand Rapids' program fell into the latter category. In those cases, the Court ruled that a state loan of instructional equipment and materials to parochial schools was an impermissible form of "direct aid" because it "advanced the primary, religion-oriented educational function of the sectarian school," 473 U. S., at 395 (citations and internal quotation marks omitted), by providing "in-

kind" aid (*e. g.*, instructional materials) that could be used to teach religion and by freeing up money for religious indoctrination that the school would otherwise have devoted to secular education. Given the holdings in *Meek* and *Wolman*, the Shared Time program—which provided teachers as well as instructional equipment and materials—was surely invalid. 473 U. S., at 395. The *Ball* Court likewise placed no weight on the fact that the program was provided to the student rather than to the school. Nor was the impermissible effect mitigated by the fact that the program only supplemented the courses offered by the parochial schools. *Id.*, at 395–397.

The New York City Title I program challenged in *Aguilar* closely resembled the Shared Time program struck down in *Ball*, but the Court found fault with an aspect of the Title I program not present in *Ball:* The Board had "adopted a system for monitoring the religious content of publicly funded Title I classes in the religious schools." 473 U. S., at 409. Even though this monitoring system might prevent the Title I program from being used to inculcate religion, the Court concluded, as it had in *Lemon* and *Meek*, that the level of monitoring necessary to be "certain" that the program had an exclusively secular effect would "inevitably resul[t] in the excessive entanglement of church and state," thereby running afoul of *Lemon*'s third prong. 473 U. S., at 409; see *Lemon*, 403 U. S., at 619 (invalidating Rhode Island program on entanglement grounds because "[a] comprehensive, discriminating, and continuing state surveillance will inevitably be required to ensure that th[e] restrictions [against indoctrination] are obeyed"); *Meek, supra,* at 370 (invalidating Pennsylvania program on entanglement grounds because excessive monitoring would be required for the State to be certain that public school officials do not inculcate religion). In the majority's view, New York City's Title I program suffered from the "same critical elements of entanglement" present in *Lemon* and *Meek:* the aid was provided "in a per-

vasively sectarian environment . . . in the form of teachers," requiring "ongoing inspection . . . to ensure the absence of a religious message." 473 U. S., at 412. Such "pervasive monitoring by public authorities in the sectarian schools infringes precisely those Establishment Clause values at the root of the prohibition of excessive entanglement." *Id.*, at 413. The Court noted two further forms of entanglement inherent in New York City's Title I program: the "administrative cooperation" required to implement Title I services and the "dangers of political divisiveness" that might grow out of the day-to-day decisions public officials would have to make in order to provide Title I services. *Id.*, at 413–414.

Distilled to essentials, the Court's conclusion that the Shared Time program in *Ball* had the impermissible effect of advancing religion rested on three assumptions: (i) any public employee who works on the premises of a religious school is presumed to inculcate religion in her work; (ii) the presence of public employees on private school premises creates a symbolic union between church and state; and (iii) any and all public aid that directly aids the educational function of religious schools impermissibly finances religious indoctrination, even if the aid reaches such schools as a consequence of private decisionmaking. Additionally, in *Aguilar* there was a fourth assumption: that New York City's Title I program necessitated an excessive government entanglement with religion because public employees who teach on the premises of religious schools must be closely monitored to ensure that they do not inculcate religion.

## B

Our more recent cases have undermined the assumptions upon which *Ball* and *Aguilar* relied. To be sure, the general principles we use to evaluate whether government aid violates the Establishment Clause have not changed since *Aguilar* was decided. For example, we continue to ask whether the government acted with the purpose of advanc-

ing or inhibiting religion, and the nature of that inquiry has remained largely unchanged. See *Witters,* 474 U. S., at 485–486; *Bowen* v. *Kendrick,* 487 U. S. 589, 602–604 (1988) (concluding that Adolescent Family Life Act had a secular purpose); *Board of Ed. of Westside Community Schools (Dist. 66)* v. *Mergens,* 496 U. S. 226, 248–249 (1990) (concluding that Equal Access Act has a secular purpose); cf. *Edwards* v. *Aguillard,* 482 U. S. 578 (1987) (striking down Louisiana law that required creationism to be discussed with evolution in public schools because the law lacked a legitimate secular purpose). Likewise, we continue to explore whether the aid has the "effect" of advancing or inhibiting religion. What has changed since we decided *Ball* and *Aguilar* is our understanding of the criteria used to assess whether aid to religion has an impermissible effect.

1

As we have repeatedly recognized, government inculcation of religious beliefs has the impermissible effect of advancing religion. Our cases subsequent to *Aguilar* have, however, modified in two significant respects the approach we use to assess indoctrination. First, we have abandoned the presumption erected in *Meek* and *Ball* that the placement of public employees on parochial school grounds inevitably results in the impermissible effect of state-sponsored indoctrination or constitutes a symbolic union between government and religion. In *Zobrest* v. *Catalina Foothills School Dist.,* 509 U. S. 1 (1993), we examined whether the IDEA, 20 U. S. C. § 1400 *et seq.,* was constitutional as applied to a deaf student who sought to bring his state-employed sign-language interpreter with him to his Roman Catholic high school. We held that this was permissible, expressly disavowing the notion that "the Establishment Clause [laid] down [an] absolute bar to the placing of a public employee in a sectarian school." 509 U. S., at 13. "Such a flat rule, smacking of antiquated notions of 'taint,' would indeed exalt

form over substance." *Ibid.* We refused to presume that a publicly employed interpreter would be pressured by the pervasively sectarian surroundings to inculcate religion by "add[ing] to [or] subtract[ing] from" the lectures translated. *Ibid.* In the absence of evidence to the contrary, we assumed instead that the interpreter would dutifully discharge her responsibilities as a full-time public employee and comply with the ethical guidelines of her profession by accurately translating what was said. *Id.*, at 12. Because the only *government* aid in *Zobrest* was the interpreter, who was herself not inculcating any religious messages, no *government* indoctrination took place and we were able to conclude that "the provision of such assistance [was] not barred by the Establishment Clause." *Id*, at 13. *Zobrest* therefore expressly rejected the notion—relied on in *Ball* and *Aguilar*—that, solely because of her presence on private school property, a public employee will be presumed to inculcate religion in the students. *Zobrest* also implicitly repudiated another assumption on which *Ball* and *Aguilar* turned: that the presence of a public employee on private school property creates an impermissible "symbolic link" between government and religion.

JUSTICE SOUTER contends that *Zobrest* did not undermine the "presumption of inculcation" erected in *Ball* and *Aguilar*, and that our conclusion to the contrary rests on a "mistaken reading" of *Zobrest*. *Post*, at 248 (dissenting opinion). In his view, *Zobrest* held that the Establishment Clause tolerates the presence of public employees in sectarian schools "only . . . in . . . limited circumstances"—*i. e.*, when the employee "simply translates for one student the material presented to the class for the benefit of all students." *Post*, at 249. The sign-language interpreter in *Zobrest* is unlike the remedial instructors in *Ball* and *Aguilar* because signing, JUSTICE SOUTER explains, "[cannot] be understood as an opportunity to inject religious content in what [is] supposed to be secular instruction." *Post*, at 248–249. He is thus able to conclude that *Zobrest* is distinguishable

from—and therefore perfectly consistent with—*Ball* and *Aguilar.*

In *Zobrest*, however, we did not expressly or implicitly rely upon the basis JUSTICE SOUTER now advances for distinguishing *Ball* and *Aguilar.* If we had thought that signers had no "opportunity to inject religious content" into their translations, we would have had no reason to consult the record for evidence of inaccurate translations. 509 U. S., at 13. The signer in *Zobrest* had the same opportunity to inculcate religion in the performance of her duties as do Title I employees, and there is no genuine basis upon which to confine *Zobrest*'s underlying rationale—that public employees will not be presumed to inculcate religion—to sign-language interpreters. Indeed, even the *Zobrest* dissenters acknowledged the shift *Zobrest* effected in our Establishment Clause law when they criticized the majority for "stray[ing] . . . from the course set by nearly five decades of Establishment Clause jurisprudence." *Id.*, at 24 (Blackmun, J., dissenting). Thus, it was *Zobrest*—and not this litigation—that created "fresh law." *Post,* at 249. Our refusal to limit *Zobrest* to its facts despite its rationale does not, in our view, amount to a "misreading" of precedent.

Second, we have departed from the rule relied on in *Ball* that all government aid that directly assists the educational function of religious schools is invalid. In *Witters* v. *Washington Dept. of Servs. for Blind,* 474 U. S. 481 (1986), we held that the Establishment Clause did not bar a State from issuing a vocational tuition grant to a blind person who wished to use the grant to attend a Christian college and become a pastor, missionary, or youth director. Even though the grant recipient clearly would use the money to obtain religious education, we observed that the tuition grants were " 'made available generally without regard to the sectarian-nonsectarian, or public-nonpublic nature of the institution benefited.' " *Id.,* at 487 (quoting *Committee for Public Ed. & Religious Liberty* v. *Nyquist,* 413 U. S. 756, 782–783,

n. 38 (1973)). The grants were disbursed directly to students, who then used the money to pay for tuition at the educational institution of their choice. In our view, this transaction was no different from a State's issuing a paycheck to one of its employees, knowing that the employee would donate part or all of the check to a religious institution. In both situations, any money that ultimately went to religious institutions did so "only as a result of the genuinely independent and private choices of" individuals. 474 U. S., at 487. The same logic applied in *Zobrest*, where we allowed the State to provide an interpreter, even though she would be a mouthpiece for religious instruction, because the IDEA's neutral eligibility criteria ensured that the interpreter's presence in a sectarian school was a "result of the private decision of individual parents" and "[could not] be attributed to *state* decisionmaking." 509 U. S., at 10 (emphasis added). Because the private school would not have provided an interpreter on its own, we also concluded that the aid in *Zobrest* did not indirectly finance religious education by "reliev[ing] [the] sectarian schoo[l] of costs [it] otherwise would have borne in educating [its] students." *Id.*, at 12.

*Zobrest* and *Witters* make clear that, under current law, the Shared Time program in *Ball* and New York City's Title I program in *Aguilar* will not, as a matter of law, be deemed to have the effect of advancing religion through indoctrination. Indeed, each of the premises upon which we relied in *Ball* to reach a contrary conclusion is no longer valid. First, there is no reason to presume that, simply because she enters a parochial school classroom, a full-time public employee such as a Title I teacher will depart from her assigned duties and instructions and embark on religious indoctrination, any more than there was a reason in *Zobrest* to think an interpreter would inculcate religion by altering her translation of classroom lectures. Certainly, no evidence has ever shown that any New York City Title I instructor teaching on parochial school premises attempted to inculcate religion in stu-

dents. *National Coalition for Public Ed. & Religious Liberty* v. *Harris*, 489 F. Supp. 1248, 1262, 1267 (SDNY 1980); *Felton* v. *Secretary, United States Dept. of Ed.*, 739 F. 2d, at 53, aff'd *sub nom. Aguilar* v. *Felton*, 473 U. S. 402 (1985). Thus, both our precedent and our experience require us to reject respondents' remarkable argument that we must presume Title I instructors to be "uncontrollable and sometimes very unprofessional." Tr. of Oral Arg. 39.

As discussed above, *Zobrest* also repudiates *Ball*'s assumption that the presence of Title I teachers in parochial school classrooms will, without more, create the impression of a "symbolic union" between church and state. JUSTICE SOUTER maintains that *Zobrest* is not dispositive on this point because *Aguilar*'s implicit conclusion that New York City's Title I program created a "symbolic union" rested on more than the presence of Title I employees on parochial school grounds. *Post*, at 250. To him, Title I continues to foster a "symbolic union" between the Board and sectarian schools because it mandates "the involvement of public teachers in the instruction provided within sectarian schools," *ibid.*, and "fus[es] public and private faculties," *post*, at 254. JUSTICE SOUTER does not disavow the notion, uniformly adopted by lower courts, that Title I services may be provided to sectarian school students in off-campus locations, *post*, at 246–247, even though that notion necessarily presupposes that the danger of "symbolic union" evaporates once the services are provided off campus. Taking this view, the only difference between a constitutional program and an unconstitutional one is the location of the classroom, since the degree of cooperation between Title I instructors and parochial school faculty is the same no matter where the services are provided. We do not see any perceptible (let alone dispositive) difference in the degree of symbolic union between a student receiving remedial instruction in a classroom on his sectarian school's campus and one receiving instruction in a van parked just at the school's curbside. To draw this line based solely on

the location of the public employee is neither "sensible" nor "sound," *post*, at 247, and the Court in *Zobrest* rejected it.

Nor under current law can we conclude that a program placing full-time public employees on parochial campuses to provide Title I instruction would impermissibly finance religious indoctrination. In all relevant respects, the provision of instructional·services under Title I is indistinguishable from the provision of sign-language interpreters under the IDEA. Both programs make aid available only to eligible recipients. That aid is provided to students at whatever school they choose to attend. Although Title I instruction is provided to several students at once, whereas an interpreter provides translation to a single student, this distinction is not constitutionally significant. Moreover, as in *Zobrest*, Title I services are by law supplemental to the regular curricula. 34 CFR § 200.12(a) (1996). These services do not, therefore, "reliev[e] sectarian schools of costs they otherwise would have borne in educating their students." 509 U. S., at 12.

JUSTICE SOUTER finds our conclusion that the IDEA and Title I programs are similar to be "puzzling," and points to three differences he perceives between the programs: (i) Title I services are distributed by LEA's "directly to the religious schools" instead of to individual students pursuant to a formal application process; (ii) Title I services "necessarily reliev[e] a religious school of 'an expense that it otherwise would have assumed'"; and (iii) Title I provides services to more students than did the programs in *Witters* and *Zobrest*. *Post*, at 251–252. None of these distinctions is meaningful. While it is true that individual students may not directly apply for Title I services, it does not follow from this premise that those services are distributed "directly to the religious schools," *post*, at 252. In fact, they are not. No Title I funds ever reach the coffers of religious schools, cf. *Committee for Public Ed. and Religious Liberty* v. *Regan*, 444 U. S. 646, 657–659 (1980) (involving a program giving "direct cash

reimbursement" to *religious schools* for performing certain state-mandated tasks), and Title I services may not be provided to religious schools on a schoolwide basis, 34 CFR § 200.12(b) (1996). Title I funds are instead distributed to a *public* agency (an LEA) that dispenses services directly to the eligible students within its boundaries, no matter where they choose to attend school. 20 U.S.C. §§ 6311, 6312. Moreover, we fail to see how providing Title I services directly to eligible students results in a greater financing of religious indoctrination simply because those students are not first required to submit a formal application.

We are also not persuaded that Title I services supplant the remedial instruction and guidance counseling already provided in New York City's sectarian schools. Although JUSTICE SOUTER maintains that the sectarian schools provide such services and that those schools reduce those services once their students begin to receive Title I instruction, see *post*, at 244, 246, 251–252, 254, his claims rest on speculation about the impossibility of drawing any line between supplemental and general education, see *post*, at 246, and not on any evidence in the record that the Board is in fact violating Title I regulations by providing services that supplant those offered in the sectarian schools. See 34 CFR § 200.12(a) (1996). We are unwilling to speculate that all sectarian schools provide remedial instruction and guidance counseling to their students, and are unwilling to presume that the Board would violate Title I regulations by continuing to provide Title I services to students who attend a sectarian school that has curtailed its remedial instruction program in response to Title I. Nor are we willing to conclude that the constitutionality of an aid program depends on the number of sectarian school students who happen to receive the otherwise neutral aid. *Zobrest* did not turn on the fact that James Zobrest had, at the time of litigation, been the only child using a publicly funded sign-language interpreter to attend a parochial school. Accord, *Mueller* v. *Allen*, 463

U. S. 388, 401 (1983) ("We would be loath to adopt a rule grounding the constitutionality of a facially neutral law on annual reports reciting the extent to which various classes of private citizens claimed benefits under the law").

What is most fatal to the argument that New York City's Title I program directly subsidizes religion is that it applies with equal force when those services are provided off campus, and *Aguilar* implied that providing the services off campus is entirely consistent with the Establishment Clause. JUSTICE SOUTER resists the impulse to upset this implication, contending that it can be justified on the ground that Title I services are "less likely to supplant some of what would otherwise go on inside [the sectarian schools] and to subsidize what remains" when those services are offered off campus. *Post*, at 247. But JUSTICE SOUTER does not explain why a sectarian school would not have the same incentive to "make patently significant cutbacks" in its curriculum no matter where Title I services are offered, since the school would ostensibly be excused from having to provide the Title I-type services itself. See *ibid.* Because the incentive is the same either way, we find no logical basis upon which to conclude that Title I services are an impermissible subsidy of religion when offered on campus, but not when offered off campus. Accordingly, contrary to our conclusion in *Aguilar*, placing full-time employees on parochial school campuses does not as a matter of law have the impermissible effect of advancing religion through indoctrination.

### 2

Although we examined in *Witters* and *Zobrest* the criteria by which an aid program identifies its beneficiaries, we did so solely to assess whether any use of that aid to indoctrinate religion could be attributed to the State. A number of our Establishment Clause cases have found that the criteria used for identifying beneficiaries are relevant in a second respect, apart from enabling a court to evaluate whether the program

subsidizes religion. Specifically, the criteria might themselves have the effect of advancing religion by creating a financial incentive to undertake religious indoctrination. Cf. *Witters,* 474 U. S., at 488 (upholding neutrally available program because it did not "creat[e a] financial incentive for students to undertake sectarian education"); *Zobrest, supra,* at 10 (upholding neutrally available IDEA aid because it "creates no financial incentive for parents to choose a sectarian school"); accord, *post,* at 253 (SOUTER, J., dissenting) ("[E]venhandedness is a necessary but not a sufficient condition for an aid program to satisfy constitutional scrutiny"). This incentive is not present, however, where the aid is allocated on the basis of neutral, secular criteria that neither favor nor disfavor religion, and is made available to both religious and secular beneficiaries on a nondiscriminatory basis. Under such circumstances, the aid is less likely to have the effect of advancing religion. See *Widmar* v. *Vincent,* 454 U. S. 263, 274 (1981) ("The provision of benefits to so broad a spectrum of groups is an important index of secular effect").

In *Ball* and *Aguilar,* the Court gave this consideration no weight. Before and since those decisions, we have sustained programs that provided aid to *all* eligible children regardless of where they attended school. See, *e. g., Everson* v. *Board of Ed. of Ewing,* 330 U. S. 1, 16–18 (1947) (sustaining local ordinance authorizing all parents to deduct from their state tax returns the costs of transporting their children to school on public buses); *Board of Ed. of Central School Dist. No. 1* v. *Allen,* 392 U. S. 236, 243–244 (1968) (sustaining New York law loaning secular textbooks to all children); *Mueller* v. *Allen, supra,* at 398–399 (sustaining Minnesota statute allowing all parents to deduct actual costs of tuition, textbooks, and transportation from state tax returns); *Witters, supra,* at 487–488 (sustaining Washington law granting all eligible blind persons vocational assistance); *Zobrest,* 509 U. S., at 10 (sustaining section of IDEA providing all "disabled" children with necessary aid).

Applying this reasoning to New York City's Title I program, it is clear that Title I services are allocated on the basis of criteria that neither favor nor disfavor religion. 34 CFR § 200.10(b) (1996); see *supra*, at 209–210. The services are available to all children who meet the Act's eligibility requirements, no matter what their religious beliefs or where they go to school, 20 U. S. C. § 6312(c)(1)(F). The Board's program does not, therefore, give aid recipients any incentive to modify their religious beliefs or practices in order to obtain those services.

### 3

We turn now to *Aguilar*'s conclusion that New York City's Title I program resulted in an excessive entanglement between church and state. Whether a government aid program results in such an entanglement has consistently been an aspect of our Establishment Clause analysis. We have considered entanglement both in the course of assessing whether an aid program has an impermissible effect of advancing religion, *Walz* v. *Tax Comm'n of City of New York*, 397 U. S. 664, 674 (1970), and as a factor separate and apart from "effect," *Lemon* v. *Kurtzman*, 403 U. S., at 612–613. Regardless of how we have characterized the issue, however, the factors we use to assess whether an entanglement is "excessive" are similar to the factors we use to examine "effect." That is, to assess entanglement, we have looked to "the character and purposes of the institutions that are benefited, the nature of the aid that the State provides, and the resulting relationship between the government and religious authority." *Id.*, at 615. Similarly, we have assessed a law's "effect" by examining the character of the institutions benefited (*e. g.*, whether the religious institutions were "predominantly religious"), see *Meek*, 421 U. S., at 363–364; cf. *Hunt* v. *McNair*, 413 U. S. 734, 743–744 (1973), and the nature of the aid that the State provided (*e. g.*, whether it was neutral and nonideological), see *Everson, supra*, at 18; *Wolman*, 433

U. S., at 244. Indeed, in *Lemon* itself, the entanglement that the Court found "independently" to necessitate the program's invalidation also was found to have the effect of inhibiting religion. See, *e. g.*, 403 U. S., at 620 ("[W]e cannot ignore here the danger that pervasive modern governmental power will ultimately intrude on religion . . ."). Thus, it is simplest to recognize why entanglement is significant and treat it—as we did in *Walz*—as an aspect of the inquiry into a statute's effect.

Not all entanglements, of course, have the effect of advancing or inhibiting religion. Interaction between church and state is inevitable, see 403 U. S., at 614, and we have always tolerated some level of involvement between the two. Entanglement must be "excessive" before it runs afoul of the Establishment Clause. See, *e. g.*, *Bowen* v. *Kendrick*, 487 U. S., at 615–617 (no excessive entanglement where government reviews the adolescent counseling program set up by the religious institutions that are grantees, reviews the materials used by such grantees, and monitors the program by periodic visits); *Roemer* v. *Board of Public Works of Md.*, 426 U. S. 736, 764–765 (1976) (no excessive entanglement where State conducts annual audits to ensure that categorical state grants to religious colleges are not used to teach religion).

The pre-*Aguilar* Title I program does not result in an "excessive" entanglement that advances or inhibits religion. As discussed previously, the Court's finding of "excessive" entanglement in *Aguilar* rested on three grounds: (i) the program would require "pervasive monitoring by public authorities" to ensure that Title I employees did not inculcate religion; (ii) the program required "administrative cooperation" between the Board and parochial schools; and (iii) the program might increase the dangers of "political divisiveness." 473 U. S., at 413–414. Under our current understanding of the Establishment Clause, the last two considerations are insufficient by themselves to create an "excessive"

entanglement. They are present no matter where Title I services are offered, and no court has held that Title I services cannot be offered off campus. *Aguilar, supra* (limiting holding to on-premises services); *Walker v. San Francisco Unified School Dist.*, 46 F. 3d 1449 (CA9 1995) (same); *Pulido v. Cavazos*, 934 F. 2d 912, 919–920 (CA8 1991); *Committee for Public Ed. & Religious Liberty v. Secretary, United States Dept. of Ed.*, 942 F. Supp. 842 (EDNY 1996) (same). Further, the assumption underlying the first consideration has been undermined. In *Aguilar*, the Court presumed that full-time public employees on parochial school grounds would be tempted to inculcate religion, despite the ethical standards they were required to uphold. Because of this risk *pervasive* monitoring would be required. But after *Zobrest* we no longer presume that public employees will inculcate religion simply because they happen to be in a sectarian environment. Since we have abandoned the assumption that properly instructed public employees will fail to discharge their duties faithfully, we must also discard the assumption that *pervasive* monitoring of Title I teachers is required. There is no suggestion in the record before us that unannounced monthly visits of public supervisors are insufficient to prevent or to detect inculcation of religion by public employees. Moreover, we have not found excessive entanglement in cases in which States imposed far more onerous burdens on religious institutions than the monitoring system at issue here. See *Bowen, supra,* at 615–617.

To summarize, New York City's Title I program does not run afoul of any of three primary criteria we currently use to evaluate whether government aid has the effect of advancing religion: It does not result in governmental indoctrination; define its recipients by reference to religion; or create an excessive entanglement. We therefore hold that a federally funded program providing supplemental, remedial instruction to disadvantaged children on a neutral basis is not invalid under the Establishment Clause when such instruc-

tion is given on the premises of sectarian schools by government employees pursuant to a program containing safeguards such as those present here. The same considerations that justify this holding require us to conclude that this carefully constrained program also cannot reasonably be viewed as an endorsement of religion. Accord, *Witters*, 474 U. S., at 488–489 ("[T]he mere circumstance that [an aid recipient] has chosen to use neutrally available state aid to help pay for [a] religious education [does not] confer any message of state endorsement of religion"); *Bowen, supra*, at 613–614 (finding no "'symbolic link'" when Congress made federal funds neutrally available for adolescent counseling). Accordingly, we must acknowledge that *Aguilar*, as well as the portion of *Ball* addressing Grand Rapids' Shared Time program, are no longer good law.

## C

The doctrine of *stare decisis* does not preclude us from recognizing the change in our law and overruling *Aguilar* and those portions of *Ball* inconsistent with our more recent decisions. As we have often noted, *"[s]tare decisis* is not an inexorable command," *Payne* v. *Tennessee*, 501 U. S. 808, 828 (1991), but instead reflects a policy judgment that "in most matters it is more important that the applicable rule of law be settled than that it be settled right," *Burnet* v. *Coronado Oil & Gas Co.*, 285 U. S. 393, 406 (1932) (Brandeis, J., dissenting). That policy is at its weakest when we interpret the Constitution because our interpretation can be altered only by constitutional amendment or by overruling our prior decisions. *Seminole Tribe of Fla.* v. *Florida*, 517 U. S. 44, 63 (1996); *Payne, supra*, at 828; *St. Joseph Stock Yards Co.* v. *United States*, 298 U. S. 38, 94 (1936) (Stone and Cardozo, JJ., concurring in result) ("The doctrine of *stare decisis* . . . has only a limited application in the field of constitutional law"). Thus, we have held in several cases that *stare decisis* does not prevent us from overruling a previous decision where

there has been a significant change in, or subsequent development of, our constitutional law. *United States* v. *Gaudin,* 515 U. S. 506, 521 (1995) (*stare decisis* may yield where a prior decision's "underpinnings [have been] eroded, by subsequent decisions of this Court"); *Alabama* v. *Smith,* 490 U. S. 794, 803 (1989) (noting that a "later development of . . . constitutional law" is a basis for overruling a decision); *Planned Parenthood of Southeastern Pa.* v. *Casey,* 505 U. S. 833, 857 (1992) (observing that a decision is properly overruled where "development of constitutional law since the case was decided has implicitly or explicitly left [it] behind as a mere survivor of obsolete constitutional thinking"). As discussed above, our Establishment Clause jurisprudence has changed significantly since we decided *Ball* and *Aguilar,* so our decision to overturn those cases rests on far more than "a present doctrinal disposition to come out differently from the Court of [1985]." *Casey, supra,* at 864. We therefore overrule *Ball* and *Aguilar* to the extent those decisions are inconsistent with our current understanding of the Establishment Clause.

Nor does the "law of the case" doctrine place any additional constraints on our ability to overturn *Aguilar.* Under this doctrine, a court should not reopen issues decided in earlier stages of the same litigation. *Messenger* v. *Anderson,* 225 U. S. 436, 444 (1912). The doctrine does not apply if the court is "convinced that [its prior decision] is clearly erroneous and would work a manifest injustice." *Arizona* v. *California,* 460 U. S. 605, 618, n. 8 (1983). In light of our conclusion that *Aguilar* would be decided differently under our current Establishment Clause law, we think adherence to that decision would undoubtedly work a "manifest injustice," such that the law of the case doctrine does not apply. Accord, *Davis* v. *United States,* 417 U. S. 333, 342 (1974) (Court of Appeals erred in adhering to law of the case doctrine despite intervening Supreme Court precedent).

## IV

We therefore conclude that our Establishment Clause law has "significant[ly] change[d]" since we decided *Aguilar.* See *Rufo,* 502 U. S., at 384. We are only left to decide whether this change in law entitles petitioners to relief under Rule 60(b)(5). We conclude that it does. Our general practice is to apply the rule of law we announce in a case to the parties before us. *Rodriguez de Quijas* v. *Shearson/American Express, Inc.,* 490 U. S. 477, 485 (1989) ("The general rule of long standing is that the law announced in the Court's decision controls the case at bar"). We adhere to this practice even when we overrule a case. In *Adarand Constructors, Inc.* v. *Peña,* 515 U. S. 200 (1995), for example, the District Court and Court of Appeals rejected the argument that racial classifications in federal programs should be evaluated under strict scrutiny, relying upon our decision in *Metro Broadcasting, Inc.* v. *FCC,* 497 U. S. 547 (1990). When we granted certiorari and overruled *Metro Broadcasting,* we did not hesitate to vacate the judgments of the lower courts. In doing so, we necessarily concluded that those courts relied on a legal principle that had not withstood the test of time. 515 U. S., at 237–238. See also *Hubbard* v. *United States,* 514 U. S. 695, 715 (1995) (overruling decision relied upon by Court of Appeals and reversing the lower court's judgment that relied upon the overruled case).

We do not acknowledge, and we do not hold, that other courts should conclude our more recent cases have, by implication, overruled an earlier precedent. We reaffirm that "[i]f a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." *Rodriguez de Quijas, supra,* at 484. Adherence to this teaching by the District Court and Court of Appeals in this litigation does not insulate a legal principle on which they relied from our review to deter-

mine its continued vitality. The trial court acted within its discretion in entertaining the motion with supporting allegations, but it was also correct to recognize that the motion had to be denied unless and until this Court reinterpreted the binding precedent.

Respondents and JUSTICE GINSBURG urge us to adopt a different analysis because we are reviewing the District Court's denial of petitioners' Rule 60(b)(5) motion for an abuse of discretion. See *Browder* v. *Director, Dept. of Corrections of Ill.*, 434 U. S. 257, 263, n. 7 (1978). It is true that the trial court has discretion, but the exercise of discretion cannot be permitted to stand if we find it rests upon a legal principle that can no longer be sustained. See *Cooter & Gell* v. *Hartmarx Corp.*, 496 U. S. 384, 405 (1990). The standard of review we employ in this litigation does not therefore require us to depart from our general practice. See *Adarand, supra; Hubbard, supra.*

Respondents nevertheless contend that we should not grant Rule 60(b)(5) relief here, in spite of its propriety in other contexts. They contend that petitioners have used Rule 60(b)(5) in an unprecedented way—not as a means of *recognizing* changes in the law, but as a vehicle for *effecting* them. If we were to sanction this use of Rule 60(b)(5), respondents argue, we would encourage litigants to burden the federal courts with a deluge of Rule 60(b)(5) motions premised on nothing more than the claim that various judges or Justices have stated that the law has changed. See also *post*, at 260 (GINSBURG, J., dissenting) (contending that granting Rule 60(b)(5) relief in this litigation will encourage "invitations to reconsider old cases based on 'speculat[ions] on chances from changes in [the Court's membership]'"). We think their fears are overstated. As we noted above, a judge's stated belief that a case should be overruled does not make it so. See *supra*, at 217.

Most importantly, our decision today is intimately tied to the context in which it arose. This litigation involves a

party's request under Rule 60(b)(5) to vacate a continuing injunction entered some years ago in light of a bona fide, significant change in subsequent law. The clause of Rule 60(b)(5) that petitioners invoke applies by its terms only to "judgment[s] hav[ing] prospective application." Intervening developments in the law by themselves rarely constitute the extraordinary circumstances required for relief under Rule 60(b)(6), the only remaining avenue for relief on this basis from judgments lacking any prospective component. See 12 J. Moore et al., Moore's Federal Practice § 60.48[5][b], p. 60–181 (3d ed. 1997) (collecting cases). Our decision will have no effect outside the context of ordinary civil litigation where the propriety of continuing prospective relief is at issue. Cf. *Teague* v. *Lane*, 489 U. S. 288 (1989) (applying a more stringent standard for recognizing changes in the law and "new rules" in light of the "interests of comity" present in federal habeas corpus proceedings). Given that Rule 60(b)(5) specifically contemplates the grant of relief in the circumstances presented here, it can hardly be said that we have somehow warped the Rule into a means of "allowing an 'anytime' rehearing." See *post*, at 259 (GINSBURG, J., dissenting).

Respondents further contend that "[p]etitioners' [p]roposed [u]se of Rule 60(b) [w]ill [e]rode the [i]nstitutional [i]ntegrity of the Court." Brief for Respondents 26. Respondents do not explain how a proper application of Rule 60(b)(5) undermines our legitimacy. Instead, respondents focus on the harm occasioned if we were to overrule *Aguilar*. But as discussed above, we do no violence to the doctrine of *stare decisis* when we recognize bona fide changes in our decisional law. And in those circumstances, we do no violence to the legitimacy we derive from reliance on that doctrine. *Casey*, 505 U. S., at 865–866.

As a final matter, we see no reason to wait for a "better vehicle" in which to evaluate the impact of subsequent cases on *Aguilar*'s continued vitality. To evaluate the Rule

60(b)(5) motion properly before us today in no way undermines "integrity in the interpretation of procedural rules" or signals any departure from "the responsive, non-agenda-setting character of this Court." *Post*, at 260 (GINSBURG, J., dissenting). Indeed, under these circumstances, it would be particularly inequitable for us to bide our time waiting for another case to arise while the city of New York labors under a continuing injunction forcing it to spend millions of dollars on mobile instructional units and leased sites when it could instead be spending that money to give economically disadvantaged children a better chance at success in life by means of a program that is perfectly consistent with the Establishment Clause.

For these reasons, we reverse the judgment of the Court of Appeals and remand the cases to the District Court with instructions to vacate its September 26, 1985, order.

*It is so ordered.*

JUSTICE SOUTER, with whom JUSTICE STEVENS and JUSTICE GINSBURG join, and with whom JUSTICE BREYER joins as to Part II, dissenting.

In this novel proceeding, petitioners seek relief from an injunction the District Court entered 12 years ago to implement our decision in *Aguilar* v. *Felton*, 473 U. S. 402 (1985). For the reasons given by JUSTICE GINSBURG, see *post*, p. 255, the Court's holding that petitioners are entitled to relief under Federal Rule of Civil Procedure 60(b) is seriously mistaken. The Court's misapplication of the Rule is tied to its equally erroneous reading of our more recent Establishment Clause cases, which the Court describes as having rejected the underpinnings of *Aguilar* and portions of *Aguilar*'s companion case, *School Dist. of Grand Rapids* v. *Ball*, 473 U. S. 373 (1985). The result is to repudiate the very reasonable line drawn in *Aguilar* and *Ball*, and to authorize direct state aid to religious institutions on an un-

paralleled scale, in violation of the Establishment Clause's central prohibition against religious subsidies by the government.

I respectfully dissent.

I

In both *Aguilar* and *Ball*, we held that supplemental instruction by public school teachers on the premises of religious schools during regular school hours violated the Establishment Clause. *Aguilar*, of course, concerned the very school system before us here and the same Title I program at issue now, see *ante*, at 211–212, under which local educational agencies receive public funds to provide remedial education, guidance, and job counseling to eligible students, including those attending religious schools. Immediately before *Aguilar*, New York City used Title I funds to provide guidance services and classes in remedial reading, remedial mathematics, and English as a second language to students at religious schools, as it did by sending employees of the public school system, including teachers, guidance counselors, psychologists, and social workers, into the religious schools. See *Aguilar*, *supra*, at 406. *Ball* involved a program similar in many respects to Title I called Shared Time,[1] under which the local school district provided religious school students with "supplementary" classes in their religious schools, taught by teachers who were full-time employees of the public schools, in subjects including remedial math and reading, art, music, and physical education. See 473 U. S., at 375.

We held that both schemes ran afoul of the Establishment Clause. The Shared Time program had the impermissible effect of promoting religion in three ways: first, state-paid teachers conducting classes in a sectarian environment might

---

[1] *School Dist. of Grand Rapids* v. *Ball*, 473 U. S. 373 (1985), also invalidated a separate program called Community Education that is distinct from the Title I program at issue today. I do not understand the Court's discussion to implicate *Ball's* evaluation of the Community Education program.

inadvertently (or intentionally) manifest sympathy with the sectarian aims to the point of using public funds for religious educational purposes, *id.*, at 388; second, the government's provision of secular instruction in religious schools produced a symbolic union of church and state that tended to convey a message to students and to the public that the State supported religion, *id.*, at 390–392; and, finally, the Shared Time program subsidized the religious functions of the religious schools by assuming responsibility for teaching secular subjects the schools would otherwise be required to provide, *id.*, at 395–396. Our decision in *Aguilar* noted the similarity between the Title I and Shared Time programs, and held that the system New York City had adopted to monitor the religious content of Title I classes held in religious schools would necessarily result in excessive entanglement of church and state, and violate the Establishment Clause for that reason. See 473 U. S., at 412–414.

As I will indicate as I go along, I believe *Aguilar* was a correct and sensible decision, and my only reservation about its opinion is that the emphasis on the excessive entanglement produced by monitoring religious instructional content obscured those facts that independently called for the application of two central tenets of Establishment Clause jurisprudence. The State is forbidden to subsidize religion directly and is just as surely forbidden to act in any way that could reasonably be viewed as religious endorsement. See, *e. g.*, *Ball*, 473 U. S., at 385 ("Although Establishment Clause jurisprudence is characterized by few absolutes, the Clause does absolutely prohibit government-financed or government-sponsored indoctrination into the beliefs of a particular religious faith"); *id.*, at 389 ("Government promotes religion as effectively when it fosters a close identification of its powers and responsibilities with those of any—or all—religious denominations as when it attempts to inculcate specific religious doctrines") (citing *Lynch* v. *Donnelly*, 465 U. S. 668, 688 (1984) (O'CONNOR, J., concurring)).

As is explained elsewhere, the flat ban on subsidization antedates the Bill of Rights and has been an unwavering rule in Establishment Clause cases, qualified only by the conclusion two Terms ago that state exactions from college students are not the sort of public revenues subject to the ban. See *Rosenberger* v. *Rector and Visitors of Univ. of Va.*, 515 U. S. 819, 868–876 (1995) (SOUTER, J., dissenting); see also *id.*, at 850 (O'CONNOR, J., concurring). The rule expresses the hard lesson learned over and over again in the American past and in the experiences of the countries from which we have come, that religions supported by governments are compromised just as surely as the religious freedom of dissenters is burdened when the government supports religion. "When the government favors a particular religion or sect, the disadvantage to all others is obvious, but even the favored religion may fear being 'taint[ed] . . . with a corrosive secularism.' The favored religion may be compromised as political figures reshape the religion's beliefs for their own purposes; it may be reformed as government largesse brings government regulation." *Lee* v. *Weisman*, 505 U. S. 577, 608 (1992) (Blackmun, J., concurring) (quoting *Ball, supra*, at 385); see also Memorial and Remonstrance against Religious Assessments 1785, in The Complete Madison 299, 309 (S. Padover ed. 1953) ("Religion flourishes in greater purity, without than with the aid of Gov[ernment]"); M. Howe, The Garden and the Wilderness 6 (1965) (noting Roger Williams's view that "worldly corruptions . . . might consume the churches if sturdy fences against the wilderness were not maintained"). The ban against state endorsement of religion addresses the same historical lessons. Governmental approval of religion tends to reinforce the religious message (at least in the short run) and, by the same token, to carry a message of exclusion to those of less favored views. See, *e. g., Ball, supra*, at 390 ("[A]n important concern of the effects test is whether the symbolic union of church and state effected by the challenged governmental action is sufficiently

likely to be perceived by adherents of the controlling denominations as an endorsement, and by the nonadherents as a disapproval, of their individual religious choices"); *Lee, supra,* at 606–607 (Blackmun, J., concurring) ("When the government puts its *imprimatur* on a particular religion, it conveys a message of exclusion to all those who do not adhere to the favored beliefs. A government cannot be premised on the belief that all persons are created equal when it asserts that God prefers some"); *Engel* v. *Vitale,* 370 U. S. 421, 429 (1962) ("[A]nguish, hardship and bitter strife" result "when zealous religious groups struggl[e] with one another to obtain the Government's stamp of approval"). The human tendency, of course, is to forget the hard lessons, and to overlook the history of governmental partnership with religion when a cause is worthy, and bureaucrats have programs. That tendency to forget is the reason for having the Establishment Clause (along with the Constitution's other structural and libertarian guarantees), in the hope of stopping the corrosion before it starts.

These principles were violated by the programs at issue in *Aguilar* and *Ball,* as a consequence of several significant features common to both Title I, as implemented in New York City before *Aguilar,* and the Grand Rapids Shared Time program: each provided classes on the premises of the religious schools, covering a wide range of subjects including some at the core of primary and secondary education, like reading and mathematics; while their services were termed "supplemental," the programs and their instructors necessarily assumed responsibility for teaching subjects that the religious schools would otherwise have been obligated to provide, cf. *Wolman* v. *Walter,* 433 U. S. 229, 243 (1977) (provision of diagnostic tests to religious schools provides only an incidental benefit); the public employees carrying out the programs had broad responsibilities involving the exercise of considerable discretion, cf. *Zobrest* v. *Catalina Foothills School Dist.,* 509 U. S. 1, 13 (1993) (sign-language interpreter

must transmit exactly what is said); *Lemon* v. *Kurtzman*, 403 U. S. 602, 616–617 (1971) (distinguishing, for Establishment Clause purposes, books provided by the State to students from teachers paid by the State); while the programs offered aid to nonpublic school students generally (and Title I went to public school students as well), participation by religious school students in each program was extensive, cf. *Witters* v. *Washington Dept. of Servs. for Blind*, 474 U. S. 481, 488 (1986) (only one student sought state tuition assistance for religious education); and, finally, aid under Title I and Shared Time flowed directly to the schools in the form of classes and programs, as distinct from indirect aid that reaches schools only as a result of independent private choice, cf. *Zobrest, supra,* at 12 ("[A]ny attenuated financial benefit that parochial schools do ultimately receive . . . is attributable to 'the private choices of individual parents'") (quoting *Mueller* v. *Allen*, 463 U. S. 388, 400 (1983)); *Witters, supra,* at 487 (aid issued to students reached religious institution "only as a result of the genuinely independent and private choices of aid recipients"); *Mueller, supra,* at 399–400 (same).

What, therefore, was significant in *Aguilar* and *Ball* about the placement of state-paid teachers into the physical and social settings of the religious schools was not only the consequent temptation of some of those teachers to reflect the schools' religious missions in the rhetoric of their instruction, with a resulting need for monitoring and the certainty of entanglement. See *Aguilar*, 473 U. S., at 412–414 (monitoring); *Ball*, 473 U. S., at 388 (risk of indoctrination). What was so remarkable was that the schemes in issue assumed a teaching responsibility indistinguishable from the responsibility of the schools themselves. The obligation of primary and secondary schools to teach reading necessarily extends to teaching those who are having a hard time at it, and the same is true of math. Calling some classes remedial does not distinguish their subjects from the schools' basic sub-

246

jects, however inadequately the schools may have been addressing them.

What was true of the Title I scheme as struck down in *Aguilar* will be just as true when New York reverts to the old practices with the Court's approval after today. There is simply no line that can be drawn between the instruction paid for at taxpayers' expense and the instruction in any subject that is not identified as formally religious. While it would be an obvious sham, say, to channel cash to religious schools to be credited only against the expense of "secular" instruction, the line between "supplemental" and general education is likewise impossible to draw. If a State may constitutionally enter the schools to teach in the manner in question, it must in constitutional principle be free to assume, or assume payment for, the entire cost of instruction provided in any ostensibly secular subject in any religious school. This Court explicitly recognized this in *Ball, supra,* at 394, 396, and although in *Aguilar* the Court concentrated on entanglement it noted the similarity to *Ball,* see *Aguilar, supra,* at 409, and Judge Friendly's opinion for the Second Circuit made it expressly clear that there was no stopping place in principle once the public teacher entered the religious schools to teach their secular subjects. See *Felton* v. *Secretary, U. S. Dept. of Education,* 739 F. 2d 48, 66–67 (CA2 1984), aff'd *sub nom. Aguilar* v. *Felton,* 473 U. S. 402 (1985).

It may be objected that there is some subsidy in remedial education even when it takes place off the religious premises, some subsidy, that is, even in the way New York City has administered the Title I program after *Aguilar.* In these circumstances, too, what the State does, the religious school need not do; the schools save money and the program makes it easier for them to survive and concentrate their resources on their religious objectives. This argument may, of course, prove too much, but if it is not thought strong enough to bar even off-premises aid in teaching the basics to religious school pupils (an issue not before the Court in *Aguilar* or

today), it does nothing to undermine the sense of drawing a line between remedial teaching on and off premises. The off-premises teaching is arguably less likely to open the door to relieving religious schools of their responsibilities for secular subjects simply because these schools are less likely (and presumably legally unable) to dispense with those subjects from their curriculums or to make patently significant cutbacks in basic teaching within the schools to offset the outside instruction; if the aid is delivered outside of the schools, it is less likely to supplant some of what would otherwise go on inside them and to subsidize what remains. On top of that, the difference in the degree of reasonably perceptible endorsement is substantial. Sharing the teaching responsibilities within a school having religious objectives is far more likely to telegraph approval of the school's mission than keeping the State's distance would do. This is clear at every level. As the Court observed in *Ball*, "[t]he symbolism of a union between church and state [effected by placing the public school teachers into the religious schools] is most likely to influence children of tender years, whose experience is limited and whose beliefs consequently are the function of environment as much as of free and voluntary choice." 473 U. S., at 390. When, moreover, the aid goes overwhelmingly to one religious denomination, minimal contact between state and church is less likely to feed the resentment of other religions that would like access to public money for their own worthy projects.

In sum, if a line is to be drawn short of barring all state aid to religious schools for teaching standard subjects, the *Aguilar-Ball* line was a sensible one capable of principled adherence. It is no less sound, and no less necessary, today.

## II

The Court today ignores this doctrine and claims that recent cases rejected the elemental assumptions underlying *Aguilar* and much of *Ball*. But the Court errs. Its holding

that *Aguilar* and the portion of *Ball* addressing the Shared Time program are "no longer good law," *ante*, at 235, rests on mistaken reading.

### A

*Zobrest* v. *Catalina Foothills School Dist.*, 509 U. S., at 13–14, held that the Establishment Clause does not prevent a school district from providing a sign-language interpreter to a deaf student enrolled in a sectarian school. The Court today relies solely on *Zobrest* to support its contention that we have "abandoned the presumption erected in *Meek* [v. *Pittenger*, 421 U. S. 349 (1975),] and *Ball* that the placement of public employees on parochial school grounds inevitably results in the impermissible effect of state-sponsored indoctrination or constitutes a symbolic union between government and religion." *Ante*, at 223. *Zobrest*, however, is no such sanction for overruling *Aguilar* or any portion of *Ball*.

In *Zobrest*, the Court did indeed recognize that the Establishment Clause lays down no absolute bar to placing public employees in a sectarian school, 509 U. S., at 13, and n. 10, but the rejection of such a *per se* rule was hinged expressly on the nature of the employee's job, sign-language interpretation (or signing) and the circumscribed role of the signer. On this point (and without reference to the facts that the benefited student had received the same aid before enrolling in the religious school and the employee was to be assigned to the student, not to the school) the Court explained itself this way: "[T]he task of a sign-language interpreter seems to us quite different from that of a teacher or guidance counselor. . . . Nothing in this record suggests that a sign-language interpreter would do more than accurately interpret whatever material is presented to the class as a whole. In fact, ethical guidelines require interpreters to 'transmit everything that is said in exactly the same way it was intended.'" *Id.*, at 13. The signer could thus be seen as more like a hearing aid than a teacher, and the signing could not be understood as an opportunity to inject religious content

in what was supposed to be secular instruction. *Zobrest* accordingly holds only that in these limited circumstances where a public employee simply translates for one student the material presented to the class for the benefit of all students, the employee's presence in the sectarian school does not violate the Establishment Clause. *Id.*, at 13–14. Cf. *Lemon* v. *Kurtzman*, 403 U. S., at 617 ("[T]eachers have a substantially different ideological character from books [and] [i]n terms of potential for involving some aspect of faith or morals in secular subjects, a textbook's content is ascertainable, but a teacher's handling of a subject is not").

The Court, however, ignores the careful distinction drawn in *Zobrest* and insists that a full-time public employee such as a Title I teacher is just like the signer, asserting that "there is no reason to presume that, simply because she enters a parochial school classroom, [this] teacher will depart from her assigned duties and instructions and embark on religious indoctrination . . . ." *Ante*, at 226. Whatever may be the merits of this position (and I find it short on merit), it does not enjoy the authority of *Zobrest*. The Court may disagree with *Ball*'s assertion that a publicly employed teacher working in a sectarian school is apt to reinforce the pervasive inculcation of religious beliefs, but its disagreement is fresh law.

The Court tries to press *Zobrest* into performing another service beyond its reach. The Court says that *Ball* and *Aguilar* assumed "that the presence of a public employee on private school property creates an impermissible 'symbolic link' between government and religion," *ante*, at 224, and that *Zobrest* repudiated this assumption, *ibid.* First, *Ball* and *Aguilar* said nothing about the "mere presence" of public employees at religious schools. It was *Ball* that specifically addressed the point and held only that when teachers employed by public schools are placed in religious schools to provide instruction to students during the schoolday a symbolic union of church and state is created and will reasonably

be seen by the students as endorsement, see *Ball*, 473 U. S., at 390–392; *Aguilar* adopted the same conclusion by reference, see 473 U. S., at 409. *Zobrest* did not, implicitly or otherwise, repudiate the view that the involvement of public teachers in the instruction provided within sectarian schools looks like a partnership or union and implies approval of the sectarian aim. On the subject of symbolic unions and the strength of their implications, the lesson of *Zobrest* is merely that less is less.

B

The Court next claims that *Ball* rested on the assumption that "any and all public aid that directly aids the educational function of religious schools impermissibly finances religious indoctrination, even if the aid reaches such schools as a consequence of private decisionmaking." *Ante*, at 222. After *Ball*, the opinion continues, the Court departed from the rule that "all government aid that directly assists the educational function of religious schools is invalid." *Ante*, at 225. But this mischaracterizes *Ball*'s discussion on the point, and misreads *Witters* and *Zobrest* as repudiating the more modest proposition on which *Ball* in fact rested.

*Ball* did not establish that "any and all" such aid to religious schools necessarily violates the Establishment Clause. It held that the Shared Time program subsidized the religious functions of the parochial schools by taking over a significant portion of their responsibility for teaching secular subjects. See 473 U. S., at 396–397. The Court noted that it had "never accepted the mere possibility of subsidization . . . as sufficient to invalidate an aid program," and instead enquired whether the effect of the proffered aid was "'direct and substantial'" (and, so, unconstitutional) or merely "indirect and incidental" (and, so, permissible), emphasizing that the question "'is one of degree.'" *Id.*, at 394 (quoting *Committee for Public Ed. & Religious Liberty* v. *Nyquist*, 413 U. S. 756, 784–785, n. 39 (1973), and *Zorach* v. *Clauson*, 343

U. S. 306, 314 (1952)). *Witters* and *Zobrest* did nothing to repudiate the principle, emphasizing rather the limited nature of the aid at issue in each case as well as the fact that religious institutions did not receive it directly from the State. In *Witters*, the Court noted that the State would issue the disputed vocational aid directly to one student who would then transmit it to the school of his choice, and that there was no record evidence that "any significant portion of the aid expended under the Washington program as a whole will end up flowing to religious education." 474 U. S., at 488. *Zobrest* also presented an instance of a single beneficiary, see 509 U. S., at 4, and emphasized that the student (who had previously received the interpretive services in a public school) determined where the aid would be used, that the aid at issue was limited, and that the religious school was "not relieved of an expense that it otherwise would have assumed in educating its students," *id.*, at 12.

It is, accordingly, puzzling to find the Court insisting that the aid scheme administered under Title I and considered in *Aguilar* was comparable to the programs in *Witters* and *Zobrest*. Instead of aiding isolated individuals within a school system, New York City's Title I program before *Aguilar* served about 22,000 private school students, all but 52 of whom attended religious schools. See App. 313–314.[2] Instead of serving individual blind or deaf students, as such, Title I as administered in New York City before *Aguilar* (and as now to be revived) funded instruction in core subjects (remedial reading, reading skills, remedial mathemat-

---

[2] The Court's refusal to recognize the extent of student participation as relevant to the constitutionality of an aid program, see *ante*, at 229–230, ignores the contrary conclusion in *Witters* v. *Washington Dept. of Servs. for Blind*, 474 U. S. 481 (1986), on this very point. See *id.*, at 488 (noting, among relevant factors, that "[n]o evidence ha[d] been presented indicating that any other person ha[d] ever sought to finance religious education or activity pursuant to the State's program").

ics, English as a second language) and provided guidance services. See *Aguilar, supra,* at 406. Instead of providing a service the school would not otherwise furnish, the Title I services necessarily relieved a religious school of "an expense that it otherwise would have assumed," *Zobrest, supra,* at 12, and freed its funds for other, and sectarian, uses.

Finally, instead of aid that comes to the religious school indirectly in the sense that its distribution results from private decisionmaking, a public educational agency distributes Title I aid in the form of programs and services directly to the religious schools. In *Zobrest* and *Witters,* it was fair to say that individual students were themselves applicants for individual benefits on a scale that could not amount to a systemic supplement. But under Title I, a local educational agency (which in New York City is the Board of Education) may receive federal funding by proposing programs approved to serve individual students who meet the criteria of need, which it then uses to provide such programs at the religious schools, see App. 28–29, 38, 60, 242–243; students eligible for such programs may not apply directly for Title I funds.[3] The aid, accordingly, is not even formally aid to the individual students (and even formally individual aid must be seen as aid to a school system when so many individuals receive it that it becomes a significant feature of the system, see *Wolman* v. *Walter,* 433 U. S., at 264 (opinion of Powell, J.)).

In sum, nothing since *Ball* and *Aguilar* and before this litigation has eroded the distinction between "direct and substantial" and "indirect and incidental." That principled line is being breached only here and now.

---

[3] For this reason, the Court's attempted analogy between Title I and the Individuals with Disabilities Education Act fails, see *ante,* at 228; James Zobrest, unlike students receiving Title I services, applied individually for the interpretative services at issue in *Zobrest* v. *Catalina Foothills School Dist.,* 509 U. S. 1, 4 (1993).

## C

The Court notes that aid programs providing benefits solely to religious groups may be constitutionally suspect, while aid allocated under neutral, secular criteria is less likely to have the effect of advancing religion. *Ante,* at 230–231. The opinion then says that *Ball* and *Aguilar* "gave this consideration no weight," *ante,* at 231, and accordingly conflict with a number of decisions. But what exactly the Court thinks *Ball* and *Aguilar* inadequately considered is not clear, given that evenhandedness is a necessary but not a sufficient condition for an aid program to satisfy constitutional scrutiny. Title I services are available to all eligible children regardless of whether they go to religious or public schools, but, as I have explained elsewhere and am not alone in recognizing, see, *e. g., Rosenberger,* 515 U. S., at 846–847 (O'CONNOR, J., concurring); *id.,* at 879–885 (SOUTER, J., dissenting); see also *Bowen* v. *Kendrick,* 487 U. S. 589, 614, 621 (1988), that fact does not define the reach of the Establishment Clause. If a scheme of government aid results in support for religion in some substantial degree, or in endorsement of its value, the formal neutrality of the scheme does not render the Establishment Clause helpless or the holdings in *Aguilar* and *Ball* inapposite.

## III

Finally, there is the issue of precedent. *Stare decisis* is no barrier in the Court's eyes because it reads *Aguilar* and *Ball* for exaggerated propositions that *Witters* and *Zobrest* are supposed to have limited to the point of abandoned doctrine. Cf. *Patterson* v. *McLean Credit Union,* 491 U. S. 164, 173–174 (1989). The Court's dispensation from *stare decisis* is, accordingly, no more convincing than its reading of those cases. Since *Aguilar* came down, no case has held that there need be no concern about a risk that publicly paid school teachers may further religious doctrine; no case has repudiated the distinction between direct and substantial aid

and aid that is indirect and incidental; no case has held that fusing public and private faculties in one religious school does not create an impermissible union or carry an impermissible endorsement; and no case has held that direct subsidization of religious education is constitutional or that the assumption of a portion of a religious school's teaching responsibility is not direct subsidization.

The continuity of the law, indeed, is matched by the persistence of the facts. When *Aguilar* was decided everyone knew that providing Title I services off the premises of the religious schools would come at substantial cost in efficiency, convenience, and money. Title I had begun off the premises in New York, after all, and dissatisfaction with the arrangement was what led the city to put the public school teachers into the religious schools in the first place. See *Felton* v. *Secretary, U. S. Dept. of Education,* 739 F. 2d, at 51. When *Aguilar* required the end of that arrangement, conditions reverted to those of the past and they have remained unchanged: teaching conditions are often poor, it is difficult to move children around, and it costs a lot of money. That is, the facts became once again what they were once before, as everyone including the Members of this Court knew they would be. No predictions have gone so awry as to excuse the litigation from the claim of precedent, see *Burnet* v. *Coronado Oil & Gas Co.,* 285 U. S. 393, 412 (1932) (Brandeis, J., dissenting), let alone excuse the Court from adhering to its own prior decision in this very litigation.

That is not to deny that the facts just recited are regrettable; the object of Title I is worthy without doubt, and the cost of compliance is high. In the short run there is much that is genuinely unfortunate about the administration of the scheme under *Aguilar*'s rule. But constitutional lines have to be drawn, and on one side of every one of them is an otherwise sympathetic case that provokes impatience with the Constitution and with the line. But constitutional lines are the price of constitutional government.

JUSTICE GINSBURG, with whom JUSTICE STEVENS, JUSTICE SOUTER, and JUSTICE BREYER join, dissenting.

The Court today finds a way to rehear a legal question decided in respondents' favor in this very case some 12 years ago. See *Aguilar* v. *Felton*, 473 U. S. 402 (1985). Subsequent decisions, the majority says, have undermined *Aguilar* and justify our immediate reconsideration. This Court's Rules do not countenance the rehearing here granted. For good reason, a proper application of those Rules and the Federal Rules of Civil Procedure would lead us to defer reconsideration of *Aguilar* until we are presented with the issue in another case.

We have a rule on rehearing, Rule 44, but it provides only for petitions filed within 25 days of the entry of the judgment in question. See this Court's Rule 44.1. Although the Court or a Justice may "shorte[n] or exten[d]" this period, I am aware of no case in which we have extended the time for rehearing years beyond publication of our adjudication on the merits. Cf. *Reid* v. *Covert*, 354 U. S. 1 (1957) (original decision issued June 11, 1956; rehearing granted Nov. 5, 1956); *Jones* v. *Opelika*, 319 U. S. 103 (1943) *(per curiam)* (original decision issued October Term 1941; rehearing granted October Term 1942). Moreover, nothing in our procedures allows us to grant rehearing, timely or not, "except . . . at the instance of a Justice who concurred in the judgment or decision." This Court's Rule 44.1. Petitioners have not been so bold (or so candid) as to style their plea as one for rehearing in this Court, and the Court has not taken up the petition at the instance of JUSTICE STEVENS, the only still-sitting Member of the *Aguilar* majority.

Lacking any rule or practice allowing us to reconsider the *Aguilar* judgment directly, the majority accepts as a substitute a rule governing relief from judgments or orders of the federal trial courts. See Fed. Rule Civ. Proc. 60(b)(5). The service to which Rule 60(b) has been impressed is unprecedented, and neither the Court nor those urging reconsidera-

tion of *Aguilar* contend otherwise. See, *e. g., ante,* at 238; Tr. of Oral Arg. 11 (acknowledgment by counsel for the United States that "we do not know of another instance in which Rule 60(b) has been used in this way"). The Court makes clear, fortunately, that any future efforts to expand today's ruling will not be favored. See *ante,* at 238–239. I therefore anticipate that the extraordinary action taken in this case will remain aberrational.

Rule 60(b) provides, in relevant part:

> "On motion and upon such terms as are just, the [district] court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: . . . (5) . . . it is no longer equitable that the judgment should have prospective application."

Under that Rule, a district court may, in its discretion, grant relief from a final judgment with prospective effect if the party seeking modification can show "a significant change either in factual conditions or in law" that renders continued operation of the judgment inequitable. *Rufo* v. *Inmates of Suffolk County Jail,* 502 U. S. 367, 384 (1992) (addressing modification of consent decree in institutional-reform setting); see 12 J. Moore, Moore's Federal Practice § 60.47[2][c], pp. 60–163 to 60–166 (3d ed. 1997); 11 C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2863, pp. 336–347 (2d ed. 1995) (hereinafter Wright, Miller, & Kane).

Appellate courts review denials of Rule 60(b) motions for abuse of discretion. See *Browder* v. *Director, Dept. of Corrections of Ill.,* 434 U. S. 257, 263, n. 7 (1978); *Railway Employees* v. *Wright,* 364 U. S. 642, 648–650 (1961). As we recognized in our unanimous opinion in *Browder,* "an appeal from denial of Rule 60(b) relief does not bring up the underlying judgment for review." 434 U. S., at 263, n. 7. For in this context,

> "[w]e are not framing a decree. We are asking ourselves whether anything has happened that will justify

us now in changing a decree. The injunction, whether right or wrong, is not subject to impeachment in its application to the conditions that existed at its making. We are not at liberty to reverse under the guise of readjusting." *United States* v. *Swift & Co.*, 286 U. S. 106, 119 (1932).

Cf. *Illinois* v. *Illinois Central R. Co.*, 184 U. S. 77, 91–92 (1902) (cautioning against entertaining successive appeals of legal questions open to dispute in an initial appeal, and observing that tolerance of such appeals would allow parties, *inter alia,* to " 'speculate on chances from changes in [a court's] members' ") (quoting *Roberts* v. *Cooper,* 20 How. 467, 481 (1858)).

In short, relitigation of the legal or factual claims underlying the original judgment is not permitted in a Rule 60(b) motion or an appeal therefrom. See 11 Wright, Miller, & Kane § 2863, p. 340 (Rule 60(b) "does not allow relitigation of issues that have been resolved by the judgment."); see also *Fortin* v. *Commissioner, Mass. Dept. of Public Welfare,* 692 F. 2d 790, 799 (CA1 1982) (warning against transformation of Rule 60(b) "modification procedure into an impermissible avenue of collateral attack"). Thus, under settled practice, the sole question legitimately presented on appeal of the District Court's decision denying petitioners' Rule 60(b)(5) motion to modify the *Aguilar* injunction would be: Did the District Court abuse its discretion when it concluded that neither the facts nor the law had so changed as to warrant alteration of the injunction?

The majority acknowledges that there has been no significant change in factual conditions. See *ante,* at 216–217. The majority also recognizes that *Aguilar* had not been overruled, but remained the governing Establishment Clause law, until this very day. See *ante,* at 217, 236. Because *Aguilar* had not been overruled at the time the District Court acted, the law the District Court was bound to respect had not changed. The District Court therefore did

not abuse its discretion in denying petitioners' Rule 60(b) motion.

We have declared that lower courts lack authority to determine whether adherence to a judgment of this Court is inequitable. Those courts must "follow the [Supreme Court] case which directly controls, leaving to this Court the prerogative of overruling its own decisions." *Rodriguez de Quijas* v. *Shearson/American Express, Inc.*, 490 U. S. 477, 484 (1989); see also *ante*, at 237–238. The District Court would have disobeyed the plain command of *Shearson/ American Express* had it granted petitioners' Rule 60(b) motion based upon a view that our more recent Establishment Clause decisions are in tension with *Aguilar.*

Without the teaching of *Shearson/American Express*, Rule 60(b) might have been employed in a case of this kind. Before that firm instruction, lower courts sometimes inquired whether an earlier ruling of this Court had been eroded to the point that it was no longer good law. See, *e. g., Rowe* v. *Peyton*, 383 F. 2d 709, 714 (CA4 1967), aff'd, 391 U. S. 54 (1968); *Perkins* v. *Endicott Johnson Corp.*, 128 F. 2d 208, 217–218 (CA2 1942), aff'd, 317 U. S. 501 (1943); *Healy* v. *Edwards*, 363 F. Supp. 1110, 1117 (ED La. 1973), vacated and remanded for consideration of mootness, 421 U. S. 772 (1975) *(per curiam); Browder* v. *Gayle*, 142 F. Supp. 707, 716–717 (MD Ala.), summarily aff'd, 352 U. S. 903 (1956). *Shearson/American Express* now controls, however, so the District Court and Court of Appeals in this case had no choice but to follow *Aguilar.* Of course, "[a] district court would necessarily abuse its discretion if it based its ruling on an erroneous view of the law," *Cooter & Gell* v. *Hartmarx Corp.*, 496 U. S. 384, 405 (1990) (cited *ante*, at 238), but the District Court made no legal error in determining that *Aguilar* had not been overruled. And our appellate role here is limited to reviewing that determination.

The Court says that the District Court was right to "entertai[n]" the Rule 60(b) motion and also right to reject it,

leaving to this Court the option of overruling our previously binding decision. See ante, at 238. The Court thus acknowledges that Rule 60(b)(5) had no office to perform in the District Court, given the no-competence instruction of *Shearson/American Express.* All the lower courts could do was pass the case up to us. The Court thus bends Rule 60(b) to a purpose—allowing an "anytime" rehearing in this case—unrelated to the governance of district court proceedings to which the Rule, as part of the Federal Rules of Civil Procedure, is directed. See Fed. Rule Civ. Proc. 1.

In an effort to make today's use of Rule 60(b) appear palatable, the Court describes its decision not as a determination of whether *Aguilar should be* overruled, but as an exploration whether *Aguilar already has been* "so undermined . . . that it is no longer good law." *Ante,* at 217–218; see also *ante,* at 222–235. But nothing can disguise the reality that, until today, *Aguilar* had not been overruled. Good or bad, it was in fact the law.

Despite the problematic use of Rule 60(b), the Court "see[s] no reason to wait for a 'better vehicle.'" *Ante,* at 239. There are such vehicles in motion, and the Court does not say otherwise. See, e. g., *Committee for Public Ed. and Religious Liberty* v. *Secretary, U. S. Dept. of Ed.,* 942 F. Supp. 842 (EDNY 1996) *(PEARL II); Helms* v. *Cody,* 856 F. Supp. 1102 (ED La. 1994); cf. Brief for U. S. Secretary of Education 45 (noting that a school district other than New York City could bring an action against the Secretary to challenge an *Aguilar*-based Title I funding decision). The *Helms* case, which has been appealed to the Fifth Circuit, involves an Establishment Clause challenge to Louisiana's special education program. In *PEARL II,* the District Court upheld aspects of New York City's current Title I program that were challenged under the Establishment Clause. The plaintiffs filed a notice of appeal in that case, but the parties later stipulated to withdraw the appeal, without prejudice to reinstatement, pending our decision in this case.

See Stipulation of Withdrawal of Appeal in *Committee for Public Ed. and Religious Liberty* v. *Secretary, U. S. Dept. of Ed.,* No. 96–6329 (CA2) (filed Mar. 20, 1997).

Unlike the majority, I find just cause to await the arrival of *Helms, PEARL II,* or perhaps another case in which our review appropriately may be sought, before deciding whether *Aguilar* should remain the law of the land. That cause lies in the maintenance of integrity in the interpretation of procedural rules, preservation of the responsive, non-agenda-setting character of this Court, and avoidance of invitations to reconsider old cases based on "speculat[ions] on chances from changes in [the Court's membership]." *Illinois Central R. Co.,* 184 U. S., at 92.