OFFICE OF THE ATTORNEY GENERAL · STATE OF TEXAS



September 26, 2001

Mr. Randall S. James
Banking Commissioner
Texas Department of Banking
2601 North Lamar
Austin, Texas 78705-4294

Opinion No. JC-0417

Re: Whether the Archdiocese of San Antonio must obtain a permit from the Texas Department of Banking in order to sell prepaid funeral benefits (RQ-0367-JC)

Dear Mr. James:

You have requested our opinion as to whether the Archdiocese of San Antonio must obtain a permit from the Texas Department of Banking pursuant to chapter 154 of the Finance Code in order to sell prepaid funeral benefits. For the reasons explained below, we conclude that a court would probably find that the provisions of chapter 154 are applicable to the Archdiocese and that the application of that chapter to the Archdiocese violates neither the Establishment Clause nor the Free Exercise Clause of the First Amendment to the United States Constitution.

Chapter 154 of the Texas Finance Code regulates the sale of prepaid funeral benefits, which are defined as:

> prearranged or prepaid funeral or cemetery services or funeral merchandise, including an alternative container, casket, or outer burial container. The term does not include a grave, marker, monument, tombstone, crypt, niche, plot, or lawn crypt unless it is sold in contemplation of trade for a funeral service or funeral merchandise to which this chapter applies.

TEX. FIN. CODE ANN. § 154.002(8) (Vernon Supp. 2001). "Funeral merchandise" or "merchandise" is defined as "goods sold or offered for sale on a preneed basis directly to the public for use in connection with funeral services." *Id.* § 154.002(11). The Archdiocese states that the only prepaid funeral benefits it sells are "the grave liner or the outer burial containers, the use of chairs and tent

at the service and, arguably, the opening and closing of the grave."[1] The stated purpose of chapter 154 is to:

> (1) limit the manner in which a person may accept funds in prepayment of funeral services to be performed in the future;

> (2) provide a regulatory framework to give the public an opportunity to arrange and pay for funerals in advance of need; and

> (3) provide all safeguards to protect the prepaid funds and to assure that the funds will be available to pay for prearranged funeral services.

*Id.* § 154.001 (Vernon 1998).

Regulation of prepaid funeral services is the province of the Texas Department of Banking. *See id.* §§ 154.002 (Vernon Supp. 2001); .051(a) (Vernon 1998). The department is empowered to adopt rules concerning:

> (1) fees to defray the cost of administering this chapter;

> (2) the keeping and inspection of records relating to the sale of prepaid funeral benefits;

> (3) the filing of contracts and reports;

> (4) changes in the management and control of an organization; and

> (5) any other matter relating to the enforcement and administration of this chapter.

*Id.* § 154.051(b) (Vernon 1998).

Chapter 154 is applicable to sellers. A seller is defined as "a person selling, accepting money or premiums for, or soliciting contracts for prepaid funeral benefits or contracts or insurance policies to fund prepaid funeral benefits in this state." *Id.* § 154.002(9) (Vernon Supp. 2001). A person means "an individual, firm, partnership, corporation, or association." *Id.* § 154.002(7). A person is required to hold a permit issued under chapter 154 in order to:

---

[1]Brief from Mr. Thomas Drought, Drought, Drought & Bobbitt, L.L.P., Attorneys for P.F. Flores, Archbishop of the Archdiocese of San Antonio, to Honorable John Cornyn, Texas Attorney General, at 2 (Jan. 16, 2001) (on file with Opinion Committee) [hereinafter Archdiocese Brief].

> (1) sell prepaid funeral benefits, or accept money for prepaid funeral benefits, in this state under any contract; or
>
> (2) solicit an individual's designation of prepaid funeral benefits to be provided out of a fund, investment, security, or contract, including a contract or policy of insurance authorized, and sold under a license issued[] by the Texas Department of Insurance, to be created or purchased by that individual at the suggestion or solicitation of the seller.

*Id.* § 154.101 (Vernon 1998). Permits are issued for a one-year term, *see id.* § 154.104, and are not transferable. *See id.* § 154.105.

The procedures for obtaining a permit are set forth in section 154.102. They include the filing of an application "on a form prescribed by the department," payment of a filing fee, currently set at $500 for a new application, and payment, if applicable, for "extraordinary expenses required for out-of-state investigation of the person." *Id.* § 154.102; *see also* 7 TEX. ADMIN. CODE § 25.23(b)(1) (2001).[2] Before issuing an initial permit, the Commissioner of Banking may investigate the applicant. *See* TEX. FIN. CODE ANN. § 154.103(a) (Vernon 1998). He is directed to "approve the application and issue a permit" if he "finds that the business ability, experience, character, financial condition, and general fitness of the applicant warrant the public's confidence." *Id.* § 154.103(b). A person whose application is not approved "is entitled to a hearing on the denial of the application, to be held not later than the 60th day after the date of the request." *Id.* § 154.103(c).

Chapter 154 also imposes a number of record-keeping and reporting requirements. Section 154.052 authorizes the department to "require a permit holder to submit an annual report in the form required by the department." *Id.* § 154.052(a). Section 154.053 provides:

> (a) A seller that has outstanding contracts for prepaid funeral benefits shall maintain in this state any record required by the department to determine whether the seller is complying with this chapter. The record is subject to annual examination by the department or its agent and to additional examinations the department considers necessary.
>
> (b) The department may examine or audit a record relating to prepaid funeral benefits at any place and in any manner the

---

[2] A renewal fee is "$100 plus $1.00 for every outstanding contract administered or held by the applicant in excess of 25 contracts, provided that the maximum fee shall not exceed $1500." 7 TEX. ADMIN. CODE § 25.23(b)(2) (2001).

department considers necessary to protect the interests of the purchasers or beneficiaries.

(c) As part of the examination, the department shall be given access to records relating to prepaid funeral benefits of each entity holding a deposit or premium for an annuity contract or a policy of insurance under the account and to any other record necessary to protect the interests of the beneficiaries.

*Id.* § 154.053. When an examination is conducted under section 154.053, the commissioner "shall impose on the seller a fee in an amount set by the department under Section 154.051 and based on the seller's total outstanding contracts." *Id.* § 154.054(a). The amount of the fee must be sufficient to cover:

(1) the cost of the examination, including:

(A) salary and travel expenses for department employees, including travel to and from the place where the records are kept; and

(B) any other expense necessarily incurred in conducting the examination;

(2) the equitable or proportionate cost of maintaining and operating the department; and

(3) the cost of enforcing this chapter.

*Id.* § 154.054(b). Information that relates "to the financial condition of a seller obtained by the department directly or indirectly, through examination or otherwise, other than published statements, is confidential," as are "[t]he files and records of the department relating to the financial condition of a seller." *Id.* § 154.055(a), (b).

Subchapter D of chapter 154 regulates sales contracts for prepaid funeral benefits. The department is required to "approve a sales contract form for prepaid funeral benefits before the form is used." *Id.* § 154.151(a). The contract must be in writing, and certain items must be included therein. *See id.* § 154.151(b). Various restrictions on sales contracts relate to representations in the contract regarding department approval and designation of an agent for the deposit of funds. *See id.* §§ 154.154 (finance charges); .155 (cancellation); .157 (performance); .158 (enforcement); .160 (agent and deposit of money). Subchapter I contains provisions for civil and criminal penalties, including injunctive relief, quo warranto, restitution, and seizure of prepaid funeral money and records. *See id.* §§ 154.401-.414.

The Archdiocese of San Antonio contends that it is not subject to the provisions of chapter 154, first because it is not a "person" under the definition thereof in section 154.002 and therefore not a "seller." *See* Archdiocese Brief, *supra* note 1, at 3. In addition, because the Archdiocese does not sell or offer prepaid funeral benefits to "the public," it argues that the legislature could not have intended to subject it to regulation. *See id.* at 2-3. Furthermore, the Archdiocese asserts that even if the legislature intended to include it within the ambit of the statute, application of the statute to the Archdiocese would contravene both the Free Exercise Clause and Establishment Clause of the First Amendment to the United States Constitution. *See id.* at 4-9. We will deal with each of these arguments in turn.

The Archdiocese acknowledges that it "sells" certain prepaid funeral benefits. *See id.* at 2. It contends, however, that it is not included within the statutory definition of "seller" because it is not a "person." *See id.* at 3. "Person," as we have noted, means "an individual, firm, partnership, corporation, or association." TEX. FIN. CODE ANN. § 154.002(7) (Vernon Supp. 2001). Clearly, the Archdiocese is not among the first four of these entities. It submits that it is also not an "association," because "an unincorporated association is not a legal entity and, in the absence of a particular statute, cannot receive and hold property." Archdiocese Brief, *supra* note 1, at 3.

An "association," under Texas law, has been said to be a "voluntary group of persons, without charter, formed by mutual consent, for purposes of promoting common enterprises or prosecuting common objectives." *Huett v. State*, 970 S.W.2d 119, 124 (Tex. App.–Dallas 1998, no writ). The Texas Supreme Court has stated that it uses the term "unincorporated charitable association" to refer to entities:

> including but not limited to those associations organized and operated for charitable, religious, recreational, or educational purposes, as well as any other bona fide nonprofit association organized and operated for the promotion of social welfare by being primarily engaged in promoting the common good and the general welfare of the people in a community. However, the term "unincorporated charitable association" does not apply generally to unincorporated associations organized or conducted for business or profit.

*Cox v. Thee Evergreen Church*, 836 S.W.2d 167, 169, n.1 (Tex. 1992). We may readily acknowledge, however, as the Texas Supreme Court does, that "[u]nincorporated associations long have been a problem for the law. They are analogous to partnerships, and yet not partnerships; analogous to corporations, and yet not corporations; analogous to joint tenancies, and yet not joint tenancies; analogous to mutual agencies, and yet not mutual agencies." *Id.* n.3.

In our opinion, we need not delve into the meaning of "association" in various contexts, for it is clear that the legislature intended in *this* context to embrace religious organizations. The original version of chapter 154 was enacted in 1955, as article 548b of the Revised Civil Statutes. At that time, the statute contained the following provision: "Nothing in this Act shall apply to

religious or benevolent organizations or associations operating in this State as a non-profit association or organization." Act of May 31, 1955, 54th Leg., R.S., ch. 512, § 1a, 1955 Tex. Gen. Laws 1292, 1293. That exception was repealed in 1963. *See* Act of May 23, 1963, 58th Leg., R.S., ch. 496, § 2, 1963 Tex. Gen. Laws 1304. Certainly, by originally inserting the exception for religious organizations, the legislature must have intended to exclude such organizations from the meaning of "association." Then, by explicitly repealing the exemption, it must have intended to embrace religious organizations within the ambit of "association." As the court said in *State v. Jones*, 570 S.W.2d 122 (Tex. Civ. App.–Austin 1978, no writ), "the existence or nonexistence of a particular intent may be inferred from the fact that an act does not contain a certain provision." *Jones*, 570 S.W.2d at 123; *accord State v. Kaiser*, 822 S.W.2d 697, 700 (Tex. App–Fort Worth 1993, pet. ref'd). We conclude that, by the terms of chapter 154, the Archdiocese of San Antonio is a "person" embraced by the statute.

The Archdiocese also maintains that, because "[i]nterment in the Archdiocesan Cemeteries is reserved exclusively for members of the Catholic faith," it does not sell prepaid funeral benefits to "the public," and thus, is not subject to chapter 154. *See* Archdiocese Brief, *supra* note 1, at 2. The definition of "funeral merchandise" requires a sale or an offer or sales of "goods . . . on a preneed basis directly to the public." TEX. FIN. CODE ANN. § 154.002(11) (Vernon Supp. 2001). On the other hand, the definition of "prepaid funeral benefits" includes not only "funeral merchandise" but also "funeral or cemetery services." *See id.* § 154.002(8). "Funeral service" is defined to encompass "a service sold or offered for sale on a preneed basis that may be used to," *inter alia*, "arrange, supervise, or conduct a funeral ceremony or the final disposition of a deceased human body." *Id.* § 154.002(12). Thus, the sale of a funeral service is covered by the statute regardless of whether it is offered directly to the public. The Archdiocese concedes that its sale of prepaid funeral services includes "the use of chairs and tent at the service and arguably, the opening and closing of the grave." Archdiocese Brief, *supra* note 1, at 3. It seems, therefore, that the sale of such services are subject to the requirements of chapter 154 even if persons of the Catholic faith are not embraced within the meaning of public.

Lest this approach seem hypertechnical, however, we note that we are also not persuaded that members of the Catholic faith do not constitute "the public." In *Texas State Board of Medical Examiners v. Koepsel*, 322 S.W.2d 609 (Tex. 1959), the Texas Supreme Court held that a physician's patients were included within a statute authorizing the cancellation of a physician's license for conduct likely to deceive or defraud the "public." *See Koepsel*, 322 S.W.2d. at 609. And in *Fermata International Melodies, Inc. v. Champions Golf Club, Inc.*,712 F. Supp. 1257 (S.D. Tex. 1989), *aff'd*, 915 F.2d 1567 (5th Cir. 1990), a federal court said that the performance of musical compositions at a private golf course before an audience of twenty-one club members and their guests was a "public" performance for purposes of establishing copyright infringement. *See also*, *Peachtree on Peachtree Inn, Inc. v. Camp*, 170 S.E.2d 709 (Ga. Ct. App. 1969) (home for aged that was open to persons at least sixty years of age who were of good moral character, ambulatory, and able to pass a medical examination, was "public" institution eligible for tax exemption). The Roman Catholic Church is a large international organization, and we do not believe that within the context of chapter 154 that it may be said that members of the Roman Catholic Church fall without the

meaning of "public." We conclude that, by its terms, chapter 154 is applicable to the Archdiocese of San Antonio.

The Archdiocese also contends that the department's attempt to apply chapter 154 to its sale of prepaid funeral services contravenes both the Free Exercise Clause and the Establishment Clause of the First Amendment. *See* Archdiocese Brief, *supra* note 1, at 4-9. The religion clauses of the First Amendment provide that Congress "shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof" U.S. CONST. amend. I. Both the Free Exercise Clause and the Establishment Clause are applicable to the states by virtue of the Fourteenth Amendment. *See Everson v. Bd. of Educ.*, 330 U.S. 1, 15-16 (1947); *Cantwell v. Connecticut*, 310 U.S. 296 (1940). As Professor Laurence Tribe notes in his treatise of American Constitutional Law, "the Supreme Court has frequently recognized that 'the two clauses may overlap.'" LAURENCE H. TRIBE, AMERICAN CONSTITUTIONAL LAW 1157 (2d ed. 1988) (citing *Abington Sch. Dist. v. Schempp*, 374 U.S. 203, 222 (1963)). On the other hand, "serious tension has often surfaced between the two clauses." LAURENCE H. TRIBE, AMERICAN CONSTITUTIONAL LAW 1157 (2d ed. 1988).

Although we have found no case that addresses the constitutionality of requiring a religious organization to obtain a permit to sell prepaid funeral services, there are numerous cases that consider the constitutionality of other laws as applied to religious organizations, and these decisions have consistently held that valid and neutral laws of general applicability do not violate the Establishment and Free Exercise clauses of the First Amendment. *See Mitchell v. Helms*, 530 U.S. 793 (2000) (holding that law providing governmental aid to public and private schools did not violate First Amendment); *Agostini v. Felton*, 521 U.S. 203 (1997) (holding law providing remedial education to parochial schools constitutional, and providing relief from permanent injunction barring public school teachers from being sent to parochial schools for purpose of providing remedial education); *Zobrest v. Catalina Foothills Sch. Dist.*, 509 U.S. 1 (1993) (provision of interpreter services to student in private Catholic school under Individuals with Disabilities Act does not violate Establishment Clause); *Kickapoo Traditional Tribe v. Chacon*, 46 F. Supp.2d 644 (W.D. Tex. 1999) (holding that tribe's First Amendment right to free exercise of its religion was not violated by state statutes authorizing disinterment and autopsy); *State v. Corpus Christi People's Baptist Church, Inc.*, 683 S.W.2d 692 (Tex. 1984) (holding state licensing procedures for childcare facilities do not violate freedom of religion clauses, and statutes with secular legislative purpose that neither advance nor inhibit religion do not violate religion clauses). Moreover, the United States Supreme Court has stated: "The only decisions in which we have held that the First Amendment bars application of a neutral, generally applicable law to religiously motivated action have involved not the Free Exercise Clause alone, but the Free Exercise Clause in conjunction with other constitutional protections, such as freedom of speech and of the press." *Employment Div. Dept. of Human Res. v. Smith*, 494 U.S. 872 (1990).[3]

---

[3]We note the subsequent history of *Smith*, which held that a compelling government interest was not required to justify the application of a neutral law toward religion. In response to *Smith*, Congress enacted the Religious Freedom Restoration Act of 1993 to "restore the compelling interest test as set forth in [prior Supreme Court cases] and to

(continued...)

More specifically, a case which we believe makes clear that chapter 154 does not violate the Free Exercise Clause is *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,* 508 U.S. 520 (1993).[4] In *Church of the Lukumi Babalu Aye,* the United States Supreme Court held that city ordinances prohibiting the ritual slaughter of animals were unconstitutional because the ordinances targeted specific religious activities without showing a compelling state interest to justify enactment. A law is found to be unconstitutional when "the object of the law is to infringe upon or restrict practices because of their religious motivation." *See Church of the Lukumi Babalu Aye,* 508 U.S. at 533. The Court said that "[i]n addressing the constitutional protection for free exercise of religion, our cases establish the general proposition that a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice." *Id.* at 531. "A law lacks facial neutrality if it refers to a religious practice without a secular meaning discernable from the language or context." *Id.* at 534. It is manifest to us that chapter 154 was not enacted for the purpose of imposing regulations upon the Catholic faith, and we do not forsee any substantial burdens resulting from the application of chapter 154 to the Archdiocese. Unlike chapter 154, the laws at issue in *Church of the Lukumi Babalu Aye* failed to show a neutral, generally applicable purpose and thus were required to be justified by a compelling governmental interest in order to pass constitutional muster. Chapter 154 does not attempt to restrict the free exercise of the Catholic religion, nor does it refer specifically to the Catholic religion or distinguish it in any way from funeral services offered by secular or other religious organizations.

With particular regard to the Establishment Clause, the three-part test announced by the United States Supreme Court in *Lemon v. Kurtzman,* 403 U.S. 602 (1971), provides that in order to pass muster under the Establishment Clause of the First Amendment, "[f]irst, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; finally, the statute must not foster an excessive government entanglement with religion." 403 U.S. 612-13 (citation omitted). The Court found the statutes at issue in *Lemon* unconstitutional because the requirements to monitor the programs involved

---

[3](...continued)
guarantee its application in all cases where free exercise of religion is substantially burdened." 42 U.S.C. 2000bb(b)(1) (1994); however, in 1997 the Supreme Court held in *City of Boerne v. Flores,* 521 U.S. 507 (1997), that Congress had exceeded its enforcement powers under the Fourteenth Amendment with the enactment of the Religious Freedom Restoration Act. *See City of Boerne v. Flores,* 521 U.S. 507. 536 (1997).

[4]Chapter 110 of the Texas Civil Practice and Remedies Code, enacted in 1999, provides that "a government agency may not substantially burden a person's free exercise of religion" unless the government agency demonstrates that application of the burden "is in furtherance of a compelling governmental interest" and "is the least restrictive means of furthering that interest." TEX. CIV. PRAC. & REM. CODE ANN. § 110.003 (Vernon Supp. 2001). The statute also provides that "[i]n determining whether an interest is a compelling governmental interest . . ., a court shall give weight to the interpretation of compelling interest in federal case law relating to the free exercise of religion clause of the First Amendment . . . ." *Id.* § 110.001(b). Our discussion of federal case law renders further discussion of chapter 110 in this opinion unnecessary; however, an in-depth analysis of chapter 110 may be found in Attorney General Opinion No. JC-200 (2000).

"excessive and enduring entanglement between state and church." *Lemon*, at 619. The Court stated that the examination of school records to distinguish expenditures used for religious instruction from those used for nonreligious instruction was "fraught with the sort of entanglement that the Constitution forbids. It is a relationship pregnant with dangers of excessive government direction of church schools and hence of churches." *Id.* at 620.

Like the statutes in *Lemon*, chapter 154 allows for government examination of records, but we do not believe that chapter 154 would be found to constitute an excessive entanglement between church and state because unlike the statutes in *Lemon*, chapter 154 does not distinguish between the provision of prepaid funeral benefits by a religious or nonreligious source. The prohibition against governmental monitoring of a religious organization's records in *Lemon* was based on the premise that the monitoring was for the purpose of distinguishing between religious and nonreligious activities. The language of chapter 154 does not reveal a similar purpose. Section 154.053 allows the department to "examine or audit a record relating to prepaid funeral benefits at any place and in any manner the department considers necessary to protect the interests of the purchasers or beneficiaries," whereas the statutes in *Lemon* provided for the examination of educational records to ascertain if funds were being used for religious or nonreligious education. *See* TEX. FIN. CODE ANN. § 154.053(b) (Vernon 1998); *Lemon*, at 620. Chapter 154 does not ask the banking commissioner to determine religious versus nonreligious content; rather, the statute merely allows the commissioner to examine the records which relate to prepaid funeral benefits within the context of chapter 154 and no more. A reasonable reading of chapter 154 in no way indicates that the statute was written for any other purpose than to provide "a regulatory framework" for all sellers of prepaid funeral benefits – regardless of whether the seller is connected to a private religious organization or other private entity – and to "provide all safeguards to protect the prepaid funds and to assure that the funds will be available to pay for prearranged funeral services." *See* TEX. FIN. CODE ANN. § 154.001 (Vernon 1998). We believe that the provisions of chapter 154, as applied to a religious organization, do not constitute an excessive entanglement of church and state. Furthermore, a more recent United States Supreme Court decision, *Agostini v. Felton*, 521 U.S. 203 (1997), has cast doubt on the validity of the *Lemon* standard. The *Agostini* Court did not overrule *Lemon*, but found the entanglement element inapposite in holding that a federal statute providing government aid to children in sectarian schools did not violate the Establishment Clause. In *Agostini*, the Court stated that a law does not have the effect of advancing religion when it is based on "neutral, secular criteria that neither favor[s] nor disfavor[s] religion, and is made available to both religious and secular beneficiaries on a nondiscriminatory basis," *Agostini*, 521 U.S. at 231 (citing *Widmar v. Vincent*, 454 U.S. 263, 274 (1981) ("The [law's] provision . . . to so broad a spectrum of groups is an important index of secular effect."). We believe that *Agostini* makes clear that laws, such as chapter 154, that have a neutral, secular purpose, do not violate the Establishment Clause of the First Amendment.

We conclude that chapter 154 of the Finance Code, as applied to sale of prepaid funeral benefits by the Archdiocese, does not contravene either the Establishment Clause or the Free Exercise Clause of the First Amendment to the United States Constitution.

## S U M M A R Y

The provisions of chapter 154 of the Texas Finance Code are applicable to religious organizations that sell prepaid funeral benefits and do not violate the Establishment Clause or Free Exercise Clause of the First Amendment to the United States Constitution.

Yours very truly,

JOHN CORNYN
Attorney General of Texas

HOWARD G. BALDWIN, JR.
First Assistant Attorney General

NANCY FULLER
Deputy Attorney General - General Counsel

SUSAN D. GUSKY
Chair, Opinion Committee

Rick Gilpin
Assistant Attorney General, Opinion Committee